2025 IL App (1st) 241168

SECOND DIVISION
January 21, 2025

No. 1-24-1168

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* S.C.-G. and L.C.-G., | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Minors-Appellees, | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | No. 18 JA 11 |
| | ) | No. 19 JA 748 |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Kevin G., | ) | Honorable |
| | ) | Diane M. Pezanoski, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court, with opinion. Justices McBride and Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    The circuit court terminated Kevin G.'s parental rights over two of his children following an unfitness hearing and a best interest hearing. On appeal, Kevin argues that the court erroneously found him unfit because reunification services were not available to him. Additionally, he contends the court erred in its best interest determination because it incorrectly found him unfit in the first place. For the following reasons, we affirm.

¶ 2                                I. BACKGROUND

¶ 3     This appeal concerns the termination of Kevin's parental rights of his two minor children: S.C.-G. (S.G.), born December 22, 2017, and L.C.-G. (L.G.), born July 10, 2019.

¶ 4     On January 5, 2018, the State filed a wardship petition for S.G., alleging neglect by the infant's mother, Francine C., who was alleged to have untreated mental health issues and substance abuse problems. At that time, Kevin's paternity had not yet been established. However, he was given two supervised visits per week. On February 14, 2018, the circuit court entered an order naming Kevin the father based on the results of a DNA test. On June 6, 2018, the court adjudicated S.G. neglected based on an injurious environment. On August 8, 2018, at the dispositional hearing, the court found both Kevin and Francine unfit and placed S.G. in the custody and guardianship of the Department of Children and Family Services (DCFS). The initial permanency order entered the same day reflected a goal of return home.

¶ 5     On July 16, 2019, the State filed a wardship petition for L.G., alleging that Francine had untreated mental health issues as well as a history of cocaine use, including while pregnant with L.G. At that time, Kevin was incarcerated. On January 24, 2020, the circuit court found that L.G. was neglected due to an injurious environment. On March 4, 2020, the court found both parents unable to care for L.G. and placed him in the custody and guardianship of DCFS. The March 4, 2020, permanency goal for L.G. was also set at return home.

¶ 6     On October 22, 2021, the court entered permanency orders changing the goal for both children to substitute care pending court determination on termination of parental rights. Kevin was still incarcerated, and Francine had not made progress in offered and recommended services. On August 24, 2022, the State petitioned the court for the appointment of a guardian with the right to consent to the adoption of both children. The petitions alleged that Kevin and Francine were

unfit under section 1(D)(b) and (m) of the Adoption Act. 750 ILCS 50/1(D)(b), (m) (West 2022). Section 1(D)(b) provides that a parent is unfit if he has failed to maintain a reasonable degree of interest, concern, or responsibility for the child's welfare. *Id.* § 1(D)(b). Section 1(D)(m) provides that a parent is unfit if he has failed to make reasonable efforts to correct the conditions which were the basis for removal of the child or failed to make reasonable progress toward the return of the children to them within nine months after the adjudication of abuse or neglect. *Id.* § 1(D)(m). The pleading for S.G. identified six separate nine-month periods, while the pleading for L.G. identified four.

¶ 7    The circuit court held a bifurcated unfitness and best interest hearing over several dates in 2024. We summarize the pertinent testimony and service plans.

¶ 8                              A. Unfitness Hearing

¶ 9                              1. Kelly Spencer

¶ 10    Kelly Spencer, a DCFS child protection specialist, testified that she began working on S.G.'s case in May 2018. Francine needed reunification services, including those to assist with parenting, mental health treatment, domestic violence issues, and substance abuse. Spencer personally assessed Kevin through an integrated assessment interview and concluded that he was also in need of reunification services. Specifically, she recommended individual therapy, random urinalysis, couples therapy, and domestic violence services. Kevin agreed to participate in the recommended services, which would aid in the return of S.G. to his care.

¶ 11    According to Kevin, his main source of income came from "hustling" and selling drugs, for which he had been arrested approximately 50 times. He has an extensive criminal history starting from the age of 14. He completed his GED at age 17 while incarcerated. Initially in 2018, both parents had supervised visits with S.G. at a McDonald's, and Kevin behaved appropriately

with S.G. However, on June 4, 2018, Spencer spoke with Francine, who told her that she and Kevin had a physical altercation that resulted in her black eye and swollen lip. Spencer spoke with Kevin the same day, and he admitted he was "physical" with Francine. Because of this incident, the visits were moved to the juvenile court building.

¶ 12    Spencer referred Kevin to individual therapy at Lawrence Hall, a social services organization, but, on January 17, 2019, Kevin told Spencer that it was too far away for him to attend. He also stated he was busy trying to obtain custody of two sons unrelated to Francine. Kevin had a total of seven children with three different women. Kevin did not request a new referral after indicating that Lawrence Hall was too far away, and he did not report having attended or completed any individual therapy.

¶ 13    On May 27, 2019, Kevin called Spencer from a detention center in Joliet. Kevin did not specify why he was there but did indicate he would likely be there for a long time. Spencer did not attempt to arrange any visits after this. Spencer learned of L.G.'s birth in July 2019, but by August 2019, she was no longer working on S.G.'s case. At the time Spencer stopped working on S.G.'s case, Kevin had still not completed the recommended services.

¶ 14                                    2. Breona Tatum

¶ 15    Breona Tatum was a Lawrence Hall employee who served as a case manager for S.G. and L.G. from April 2020 to April 2021. When she was assigned this case, Kevin was incarcerated at a correctional center in Chicago. She attempted to contact him in prison and did so successfully once or twice. Kevin was not and had not engaged in any reunification services. Tatum spoke to a social worker or warden at the correctional center but was not able to arrange services or visits. Visits had been suspended due to COVID-19.

¶ 16                                    3. Alyssa Lavroff

¶ 17    Alyssa Lavroff was a caseworker for S.G. and L.G. from September 2021 until April 2022. Three months into her assignment, she spoke with Kevin over the phone. However, she was unable to arrange visits or facilitate reunification services due to ongoing COVID-19 policies. Lavroff and her supervisor assessed the case and recommended substitute care pending court determination on termination of parental rights because there had been no progress toward unsupervised visits, and neither parent had completed recommended services.

¶ 18                                    4. Julia Levy

¶ 19    Julia Levy, a child welfare specialist with Lawrence Hall, began her assignment on S.G.'s and L.G.'s case in June 2022. At the time of the hearing, she was still assigned to the cases. When Levy's assignment began, Kevin was still incarcerated at the correctional center in Chicago. In December 2023, he e-mailed her a certificate of completion of the first phase of a parenting program. She was not sure what exactly the first phase covered, as Kevin had taken the course in prison. Kevin did not report having completed mental health assessments or substance abuse treatment nor having engaged in domestic violence prevention services.

¶ 20    In March 2023, Kevin asked Levy whether she could arrange visits. Levy, along with her supervisor and a clinical therapist, decided that monthly phone visits would be appropriate. Starting in April 2023, Kevin attended six of the nine arranged phone visits from prison. L.G., the younger child, "definitely [did] not understand" who Kevin was and did not want to speak on the phone most of the time. S.G., however, engaged in conversation with Kevin. Kevin has more of a relationship with S.G. Overall, the phone calls went well. Of the three scheduled calls that did not take place, Kevin did not confirm that he would attend two, while one call did not take place due to technical issues.

¶ 21                                    5. Kevin G.

¶ 22    Kevin's testimony included a written statement to the court, which read, in part:

> "I titled this Healthy Relationships. First and foremost, I would like to state no words can possibly express how much I love Francine and all of our children. All forms of human relationship is [*sic*] based upon falsehood and lies cannot survive and I say this simply in regard to [S.G.] and [L.G.] along with myself and Francine being subject of an elaborate system that has broken up and damaged countless family units. The opportunity to be able to have a prosperous and positive relationship with our children has been and continues to be limited because of the history of not just me and Francine's behavioral patterns but more so the history of America as a nation."

¶ 23    Kevin went on to explain that slavery and mind control have mentally damaged African Americans today. Inequalities have limited access to education and hindered fairness in the judicial system for Blacks. By refusing to reunify the family, the system would deprive S.G. and L.G. of parents who are the only ones able to explain to them the intricacies of transatlantic slave trade, the Civil War, and other topics in a way that would not misinform them (as would likely happen if they are placed with another family).

¶ 24    Kevin stated that he loves his family, plans to marry Francine, considers himself an experienced father, and can tell just by speaking to S.G. how much she needs her biological parents in her life. He enjoyed his phone calls with his children, and the calls really helped him. By not allowing communication between biological parents and their children, the children can be manipulated by society in a way that Kevin finds undesirable. Kevin concluded by saying he will continue to communicate with his children within the parameters of what the court allows and will respect the laws and policies of the United States.

¶ 25                                        6. Service Plans

¶ 26    Service plans are created and updated periodically by DCFS staff and intended to remedy the condition or conditions that gave rise to a finding of child abuse or neglect. 325 ILCS 5/8.2 (West 2022). At the hearing in this case, the State introduced service plans covering the period between June 2018 and November 2023. These plans include additional information about Kevin's criminal history as well as reunification services.

¶ 27    On May 2, 2017, Kevin was arrested for "ESCAPE/VIO ELECTRONIC MONITOR." The initial service plan indicates that Kevin had three assault convictions as well as numerous open charges for other offenses. However, as of March 28, 2019, he was incarcerated in Joliet. Before his incarceration, his case plan recommendations included compliance with drug court probation, random urinalysis, and an intensive outpatient treatment program. Reunification was the ultimate goal of these recommendations. However, he was evaluated as "unsatisfactory" toward making progress toward unification on May 20, 2019, due to his incarceration. He continued to receive unsatisfactory evaluations on December 18, 2019, June 15, 2020, and December 3, 2020. The December 3 evaluation noted that Kevin "has not participated with his social worker to obtain the necessary services." He received unsatisfactory evaluations on June 24, 2021, and December 9, 2021. In short, Kevin never received a satisfactory evaluation in the history of the case being in the court system.

¶ 28    In addition to the certificate for the parenting class that Kevin e-mailed Levy in December 2023, Kevin offered, as an exhibit, a 2022 certificate from the correctional center in Chicago. The certificate indicated he had taken a course on how to market oneself, business plans, and interview skills. Based on the foregoing, the circuit court found both Kevin and Francine unfit and then proceeded to a best interest hearing.

¶ 29                              B. Best Interest Hearing

¶ 30                                    1. Julia Levy

¶ 31    Julia Levy testified that S.G. and L.G. were living together in a licensed specialized foster home. Levy described the home as safe and appropriate, with no signs of abuse, neglect, or corporal punishment. S.G., age six at the time, had asthma, which was being treated, and her health was otherwise good. L.G., age four at the time, was receiving speech therapy, occupational therapy, and had been diagnosed with a developmental delay. He was receiving proper therapy and psychiatric treatment for his attention deficit hyperactivity disorder (ADHD), oppositional defiance, and anger issues. Levy had no concerns that the foster mother, Kerrigan McNulty, was taking good care of S.G. and L.G.

¶ 32    S.G. and McNulty had a very loving and bonded relationship. S.G. calls McNulty "mommy" and looks to her for guidance and support. Similarly, L.G. calls McNulty "mommy" and enjoys receiving hugs and snuggles from her. S.G. and L.G. have a normal sibling relationship; sometimes they play together, while other times they prefer to play alone with their toys. McNulty has an adopted daughter, with whom S.G. and L.G. have a sibling-like relationship. Overall, Levy believed that McNulty was meeting all of their needs and has been meeting them ever since they were initially placed with her. McNulty was committed to providing permanency for both children.

¶ 33                                    2. Kerrigan McNulty

¶ 34    McNulty is S.G. and L.G.'s foster mother. McNulty has been providing care for S.G. since S.G. was 10 days old. S.G. and McNulty's adoptive daughter are close; they play and read books together, do each other's hair, and share a room.

¶ 35    McNulty has been providing care for L.G. since he was two days old. He has an individualized education program at school and recently graduated from speech therapy. McNulty takes him to a private speech therapist twice a week, and he sees a psychiatrist every six weeks for

treatment of his social anxiety, ADHD, disruptive mood dysregulation disorder, and trauma and stress-related disorder. McNulty has grown very close with L.G. and learned how to understand and respond to his anxiety and behavior. L.G. and McNulty's adoptive daughter got along well. All three children spend a lot of time together, including swimming at a nearby athletic club and going on vacation to visit McNulty's brother in Atlanta.

¶ 36    McNulty was fully committed to permanency. She did not believe there were any barriers to long-term treatment and services for both children in the future. Though L.G. does not fully understand who Kevin is, McNulty did not take issue with receiving occasional letters from Kevin. However, McNulty unequivocally stated that "it's in the best interest of them to be with me."

¶ 37                C. The Circuit Court's Reasoning in the Bifurcated Hearing

¶ 38    After the circuit court found both Kevin and Francine to be unfit, it found that it was in the best interest of both children to terminate parental rights.

¶ 39    As to unfitness, the court found that the State had shown, by clear and convincing evidence, that Kevin was unfit under grounds 1(D)(b) and (m) of the Adoption Act. 750 ILCS 50/1(D)(b), (m) (West 2022). The court noted that while ground 1(D)(b) requires reasonable efforts and not necessarily successful efforts, merely demonstrating *some* interest or affection does not render a parent fit. The court found the four caseworkers' testimonies credible and relied on them in reaching its decision. The court noted that Spencer testified about speaking to Kevin and reminding him about the need to finish services, but he never completed services. Around the time Spencer ended her assignment on the case, Kevin was incarcerated. The second case worker, Tatum, similarly testified that Kevin had not engaged in services. Kevin also never reported completing any services to the next caseworker, Lavroff. Finally, by the time Levy was assigned to the case, the permanency goal had already changed to termination of parental rights, as five years had passed

with no measurable progress remedying the conditions that led to removal of the children. The court then turned to ground 1(D)(m) and focused on reasonable progress, concluding that "the court would not have been able to order the child returned to parental custody because of the lack of progress in services and the outstanding services that remain even until this day."

¶ 40　　As to the children's best interests, the court opened by noting that "At a best interest hearing, the parents' interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." That is, "a child's best interest is superior to all other factors, including the interest of the biological parents." The court then set forth the testimony that supported the relevant statutory best interest factors and also focused on the length and nature of the relationship between the foster parent and children, as allowed by precedent. The court held that the State had shown, by a preponderance of the evidence, that termination of both Kevin's and Francine's parental rights was in the best interest of S.G. and L.G.

¶ 41　　Kevin appeals the circuit court's findings as to his unfitness and termination of his parental rights.

¶ 42　　　　　　　　　　　　　　　II. ANALYSIS

¶ 43　　On appeal, Kevin argues that the circuit court incorrectly (1) found him unfit and (2) terminated his parental rights over S.G. and L.G.

¶ 44　　The Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)), in conjunction, prescribe the authority and scope of the court to involuntarily terminate parental rights. *In re M.I.*, 2016 IL 120232, ¶ 19. Illinois policy favors parents' right to custody of their own children. *Id.*

¶ 45　　Section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2022)) provides a two-step process for the involuntary termination of parental rights. *In re M.I.*, 2016 IL 120232,

¶ 20. First, the court must find that, by clear and convincing evidence, a parent is an unfit person as defined in section 1 of the Adoption Act. *Id.*; 705 ILCS 405/2-29(2) (West 2022). If the court has found that a parent is unfit, the court then considers whether the State has shown, by a preponderance of the evidence, that termination of parental rights is in the best interest of the child. *In re D.T.*, 212 Ill. 2d 347, 366 (2004).

¶ 46    We will reverse the circuit court's findings only if they are against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004). "Because a trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings merely because the reviewing court may have reached a different decision." *In re April C.* 326 Ill. App. 3d 245, 257 (2001) (citing *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1998)). "Ultimately, there is a 'strong and compelling presumption in favor of the result reached by the trial court' in child custody cases." *In re William H.*, 407 Ill. App. 3d 858, 866 (2011) (quoting *Connor v. Velinda C.*, 356 Ill. App. 3d 315, 323 (2005)).

¶ 47                                      A. Unfitness

¶ 48    Kevin argues that the circuit court's findings of unfitness were improper under section 1(D)(b) and (m) of the Adoption Act. 750 ILCS 50/1(D)(b), (m) (West 2022).

¶ 49    Section 1(D) of the Adoption Act provides, in relevant part:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following, except that a person shall not

be considered an unfit person for the sole reason that the person has relinquished a child in accordance with the Abandoned Newborn Infant Protection Act:

\* \* \*

(b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare.

\* \* \*

(m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act. If a service plan has been established as required under Section 8.2 of the Abused and Neglected Child Reporting Act to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication under Section 2-3 or 2-4 of the Juvenile Court Act of 1987. Notwithstanding any other provision, when a petition or motion seeks to terminate parental rights on the basis of item (ii) of this subsection (m), the

12

petitioner shall file with the court and serve on the parties a pleading that specifies the 9-month period or periods relied on." 750 ILCS 50/1(D)(b), (m) (West 2022).

It is important to note that although the State may rely on several grounds in its petition, a finding adverse to the parent on any one ground is sufficient to support a subsequent termination of parental rights. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 50                                           1. Section 1(D)(b)

¶ 51     Kevin contends that the circuit court erred in its finding that he failed to show a reasonable degree of interest, concern, or responsibility for his children's welfare, which is a ground for unfitness under section 1(D)(b). 750 ILCS 50/1(D)(b) (West 2022). In assessing whether a parent is unfit under this section, the court considers the parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, including inquiries into the child's welfare. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006) (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 278-79 (1990)). The interest, concern, or responsibility must be reasonable. *Id.* Section 1(D)(b) is phrased in the disjunctive, meaning that any of the three elements (interest, concern, or responsibility) may be considered on its own as a basis for unfitness. *In re J.B.*, 2014 IL App (1st) 140773, ¶ 51. Courts consider a parent's conduct in the context of the circumstances in which it occurs, including any difficulty in obtaining transportation to the child's residence, the parent's poverty, conduct of others that hinders visitation, and motivation underlying the failure to visit. *In re Daphnie E.*, 368 Ill. App. 3d at 1064. A parent need not be at fault to be unfit, and he is not fit merely because he had demonstrated some interest in or affection for his child. *Id.* Where personal visits are impractical, courts consider whether the parent has demonstrated a reasonable degree of concern through letters, phone calls, and gifts to the child. *Id.* A court can consider a parent's completion of service plan objectives as evidence of a parent's concern, interest, and

responsibility. *Id.* at 1065. Courts will consider a parent's efforts even if they were ultimately unsuccessful. *Id.*

¶ 52   During his testimony during the unfitness hearing, Kevin showed interest in S.G.'s and L.G.'s welfare by stressing the importance of raising them with Francine and that S.G. and L.G. would grow up with unanswered questions and misinformation if they were raised by someone other than their biological parents. He also stated that he loved his family. In March 2023, Kevin asked Levy whether she could arrange visits, and ultimately, he attended six out of nine pre-arranged phone calls with his S.G. and L.G. While the foregoing may suggest some level of interest, that is not enough. *Id.* at 1064 (a parent is not fit merely because he has shown some interest in or affection for the child) Additionally, the overwhelming evidence indicates an insufficient degree of interest shown or responsibility taken.

¶ 53   Based on her integrated assessment interview with Kevin, Spencer recommended that he engage in individual therapy, couples therapy, domestic violence classes, and parenting classes. Rather than participate earnestly in these services and progress toward reunification, Kevin did the opposite by engaging in behavior that would only further delay reunification. On June 4, 2018, Kevin admitted that he was involved in a physical altercation with Francine that resulted in her black eye and bruised lip. Consequently, the visits he and Francine had with S.G. and L.G. at McDonald's were moved from McDonald's to the juvenile court. Also in 2018, Spencer referred Kevin to individual therapy. In January 2019, Kevin told Spencer it was too far for him to attend, and he did not ask for a new referral. Kevin was incarcerated starting on March 28, 2019, up through the hearings in this case. Between March 2019 and October 2023, he did not complete any of the recommended reunification services. It was not until October 2023 that he completed one phase of a parenting class.

¶ 54     Kevin argues that it is paradoxical to hold him accountable for not partaking in nonexistent services. We presume that he is referring to the period of time when services in prison were suspended due to COVID-19. "When official action frustrates parental efforts, their fitness will be judged by actions that show their intent, rather than by their ultimate success." *In re S.B.*, 348 Ill. App. 3d 61, 67 (2004). It was not until several years into his incarceration that Kevin requested Spencer to arrange visits with his children. That is, there is little evidence in the record of any intent on Kevin's part prior to 2023 to complete the recommended services. Prior to his incarceration, his actions (such as battering Francine) and inaction (failing to attend individual therapy) indicated a complete lack of intent to take the recommended services seriously that were designed to reunite him with his children. Additionally, Kevin was incarcerated for about a year before the COVID-19 pandemic began. He has not shown that he made any attempt or even inquiry during that time to engage in any services. Blaming the pandemic shutdown for Kevin's inaction is particularly unavailing when his time in prison included substantial periods of time both before and after the pandemic where he would have had access to services.

¶ 55     Based on the foregoing, we conclude that ample evidence supported the circuit court's finding that Kevin was unfit as to both S.G. and L.G. under section 1(D)(b), and its decision was certainly not against the manifest weight of the evidence.

¶ 56                                   2. Section 1(D)(m)

¶ 57     As the grounds for unfitness set forth in section 1(D)(m) of the Adoption Act are also phrased in the disjunctive, section 1(D)(m) provides two independent bases for a finding of unfitness: (1) the failure by the parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child *or* (2) the failure to make reasonable progress toward the return of the child. *In re C.N.*, 196 Ill. 2d 181, 210-11 (2001). Here, the court focused on

reasonable progress; that is, it found Kevin unfit under subsection (D)(m)(ii). 750 ILCS 50/1(D)(m)(ii) (West 2022).

¶ 58    Under subsection (D)(m)(ii), the court assesses "reasonable progress" under an objective standard based on the amount of progress measured from conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *Id.* Our supreme court has held that the appropriate benchmark for measuring progress

> "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d at 216-17.

A court should find reasonable progress satisfied where it can conclude that it will be able to order the children returned to parental custody in the near future. *In re Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 59    Because section 1(D)(m)(ii) contains a time frame parameter, we examine Kevin's progress toward reunification within the nine-month periods set forth by the State. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 63. Time spent incarcerated does not toll the nine-month periods. *In re J.L.*, 236 Ill. 2d 329, 341 (2010). Failure to make progress during any nine-month period is sufficient to support a finding of unfitness. *Id.* at 340.

¶ 60    S.G.'s wardship pleading identified the following nine-month periods: (1) June 6, 2018, until March 6, 2019; (2) March 6, 2019, until December 6, 2019; (3) December 6, 2019, until September 6, 2020; (4) September 6, 2020, until June 6, 2021; (5) June 6, 2021, until March 6, 2022; and (6) November 24, 2021, until August 24, 2022.

¶ 61     We start with the first nine-month period: June 6, 2018, until March 6, 2019. For context, on May 31, 2018, Spencer conducted an integrated assessment interview with Kevin. She referred him to individual therapy at Lawrence Hall. On or around June 4, 2018, Kevin battered Francine. On July 30, 2018, Spencer completed her integrated assessment report, in which she noted that Kevin agreed to participate in recommended services aimed at reunification with S.G., which included individual therapy, domestic violence classes, and parent coaching. The November 9, 2018, service plan notes that Kevin was taking domestic violence classes but had not engaged in individual therapy. Kevin did not take a single parenting class until 2023 in prison. He never engaged in individual therapy. Though he complained that Lawrence Hall was too far, he never asked for a new referral for a closer venue. Thus, it appears that the only recommended service Kevin may have engaged in during the first nine-month period was domestic violence classes, but he never completed them. Additionally, during this nine-month period, there was nothing to indicate that Kevin would soon be allowed unsupervised visits, let alone receive custody in the near future due to the domestic violence exhibited and the lack of engagement or progress in the services. In sum, Kevin engaged in only one of several recommended services, so we cannot say the circuit court's determination that he had not made reasonable progress was against the manifest weight of the evidence.

¶ 62     Having found the court's conclusion that Kevin failed to make reasonable progress in the first nine-month period the State offered for S.G. was not against the manifest weight of the evidence, we need not consider the remaining nine-month periods, as nothing changed during them. *Id.* We turn to L.G.

¶ 63    L.G.'s wardship pleading identified the following nine-month periods: (1) January 24, 2020, until October 24, 2020; (2) October 24, 2020, until July 24, 2021; (3) July 24, 2021, until April 24, 2022; and (4) November 24, 2021, until August 24, 2022.

¶ 64    We start with the first nine-month period: January 24, 2020, until October 24, 2020. Kevin was incarcerated throughout this period as well as the three other nine-month periods set forth above. There is no evidence of Kevin's participation or attempt to engage in any of the recommended services during this nine-month period. As noted above, he did not ask Spencer to arrange any visits with either S.G. or L.G. until March 2023. Even if we were to entirely excuse Kevin's inaction during this nine-month period, we cannot glean any intent from his actions prior to the pandemic shutdown that would indicate even a desire to show reasonable progress. He was incarcerated for about a year before the pandemic started, and he did not seek services. Before incarceration, he engaged in only one service for which he did not submit any proof of completion. There is absolutely nothing in the record that even hints at any progress during this nine-month period. The circuit court's decision was amply supported by the testimony and service plans.

¶ 65    Having found the court's conclusion that Kevin failed to make reasonable progress in the first nine-month period the State offered for L.G. was not against the manifest weight of the evidence, we need not consider the remaining nine-month periods. *Id.* We note that Kevin never sufficiently engaged nor progressed in any reunification services.

¶ 66    Based on the foregoing, we conclude that the circuit court's finding that Kevin was unfit as to both S.G. and L.G. under section 1(D)(m) was not against the manifest weight of the evidence.

¶ 67                                    B. Best Interest

¶ 68    After a finding of parental unfitness, the court proceeds to the best interest stage, where the State must show, by a preponderance of the evidence, that termination is in the child's best interest.

18

*In re D.T.*, 212 Ill. 2d at 366. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. The court considers, in the context of the child's age and developmental needs, 10 factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2022).

¶ 69    Kevin argues only that because the court incorrectly found him unfit, it automatically erred in its decision that terminating his parental rights was in the best interest of the children. He does not address or bring any challenge to the circuit court's analysis of best interests or its ultimate decision on that issue. Because we have held that the circuit court correctly found Kevin unfit, and Kevin does not raise any substantive argument as to best interests, we need not engage in a review of the court's decision on best interests. *In re J.B.*, 2014 IL App (1st) 140773, ¶ 62 (" 'An issue that is merely listed or included in a vague allegation of error is not "argued" and will not satisfy the requirements of [Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020)].' " (quoting *Vancura v. Katris*, 238 Ill. 2d 352, 369-70 (2010))); *In re Alexander R.*, 377 Ill. App. 3d 553, 556 (2007) ("Normally, we 'presume that the trial judge knows and follows the law unless the record indicates otherwise.' " (quoting *People v. Gaultney*, 174 Ill. 2d 410, 420 (1996))).

¶ 70                                    III. CONCLUSION

¶ 71     For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 72     Affirmed.

***In re S.C.-G.*, 2025 IL App (1st) 241168**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 18-JA-11, 19-JA-748; the Hon. Diane M. Pezanoski, Judge, presiding. |
| **Attorneys for Appellant:** | David Gotzh, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), for appellee. |