NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251359-U

NO. 4-25-1359

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 14, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re J.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 24JA172 |
| v. | ) | |
| Malcom W., | ) | Honorable |
| Respondent-Appellant). | ) | Erin B. Buhl, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Lannerd and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court granted appellate counsel's motion to withdraw and affirmed, finding the trial court's termination of respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    In September 2025, the State filed a petition for termination of parental rights against, *inter alia*, respondent, Malcom W., the father of J.P. (born in September 2023). In December 2025, the trial court granted the petition and terminated Malcom's parental rights.

¶ 3    On appeal, appellate counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *In re Alexa J.*, 345 Ill. App. 3d 985 (2003), arguing Malcom's appeal presents no potentially meritorious issues for review. We grant the motion and affirm the trial court's judgment.

¶ 4    I. BACKGROUND

¶ 5    On May 16, 2024, the State filed a petition alleging J.P. was neglected because

(1) his environment was injurious to his welfare in that there was domestic violence in the home, (2) he was not receiving adequate food, clothing, or shelter in that he and his siblings "were observed to be malnourished," and (3) he suffered a skull fracture. See 705 ILCS 405/2-3(1)(a), (b) (West 2024).

¶ 6        On August 30, 2024, J.P.'s mother, Destiny P., stipulated to the petition's first count, and the remaining counts were dismissed. Malcom did not object to the stipulation. The trial court informed Malcom that he had the right to a hearing and was permitted to object to the stipulation, and by not objecting to the stipulation, he was waiving his right to a hearing. Malcom stated he understood. The court accepted Destiny's stipulation, found Malcom made a knowing and voluntary waiver, and adjudicated J.P. a neglected minor. During the same hearing, Malcom and Destiny stipulated they were unfit or unable but not unwilling to care for, protect, train, or discipline J.P. and his siblings. Per their agreement with the State, J.P.'s guardianship and custody would remain with the Illinois Department of Children and Family Services (DCFS), both parents would be required to cooperate with DCFS, and DCFS maintained discretion over visitation and J.P.'s placement. The court entered a dispositional order making J.P. a ward of the court.

¶ 7        On September 15, 2025, the State filed a petition to terminate Malcom's parental rights. The petition alleged Malcom was an unfit parent because failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to J.P.'s welfare and (2) make reasonable progress toward the children's return to her care within the nine months from November 29, 2024, through August 29, 2025. See 750 ILCS 50/1(D)(b), (m)(ii) (West 2024).

¶ 8                              A. Fitness Hearing

¶ 9        The trial court conducted a fitness hearing on November 6, 2025, during which

Zachary Adams testified he was the DCFS child welfare specialist assigned to J.P.'s case since September 2024. According to Adams, J.P. came into DCFS's care due to ongoing domestic violence between Malcom and Destiny, the condition of the home, a lack of parental supervision, and J.P.'s malnutrition. Malcom was incarcerated for the majority of the case, until his release in September 2025.

¶ 10 DCFS requested Malcom complete domestic violence counseling, a substance abuse assessment and any recommended treatment, and a mental health assessment and any recommended treatment. Malcom was also required to cooperate with DCFS, complete parenting classes, and comply with drug testing. Throughout the case, Malcom "was not willing or did not provide any verification of any services he did." Malcom self-reported he completed anger management classes while incarcerated, but he did not provide verification. After Malcom was released, Adams scheduled a child and family team meeting in October 2025, but Malcom did not attend it. Malcom also failed to appear at both of his scheduled drug tests. In one instance, Malcom said he was in Chicago, Illinois, and could not get to the testing site in Rockford, Illinois. Malcom did not provide any reason for missing the other drug test. At the time of the fitness hearing, Malcom had not completed any of the required services.

¶ 11 While Malcom was incarcerated, he was allowed weekly visits with J.P. At Malcom's request, these visits were "all on video or phone" rather than in person. However, Malcom often would not confirm or attend the visits, even after the other attendees had logged into the meeting. Malcom attended "two or three" visits with J.P. Malcom's conduct was appropriate during those visits, but his interaction with J.P. was "very, very limited." Malcom did not have any visits with J.P. after his release. This was due to Malcom's refusal to meet with Adams to discuss the status of the case, the agency's expectations for Malcom following his

release, and the process for visits now that Malcom was no longer incarcerated. At the meeting, Adams would have been able to provide Malcom with information on where to complete his services and the necessary documentation—this information was best communicated in person, rather than via text messages or during a phone conversation. This preliminary meeting was a requirement for Malcom to visit with J.P. However, Adams testified Malcom was "unwilling" to meet with him.

¶ 12  At no point during the case did Malcom send gifts or letters to J.P. DCFS had concerns regarding Malcom's ability to parent J.P. safely because Malcom did not have any other children, was incarcerated for most of this case's pendency, and had a significant criminal history.

¶ 13  Malcom testified he was incarcerated for "[a] weapons charge and drug charge." He faced domestic battery charges in February 2023, but he was not convicted of them. Malcom had never met J.P. in person, but he "used to talk *** to [J.P.] face to face over the visits a lot." Malcom believed J.P. would remember his voice but probably not his face. Malcom testified he and J.P. were "building a nice little bond," and J.P. smiled at him when they spoke to each other. Malcom insisted he did not cancel any visits while he was incarcerated. He testified he completed an anger management class while he was incarcerated, and his course certificate was admitted into evidence. He had a mental health examination while incarcerated, but he did not pursue further mental health treatment because he believed he "didn't really need it." While he was incarcerated, Malcom was involved in substance abuse treatment for approximately three weeks, but he did not complete the program before his release. He was not currently participating in any substance abuse services.

¶ 14  Malcom testified he missed one of his scheduled drug drops because he was

- 4 -

attending a funeral out of town, and he missed the other drop due to transportation issues. Malcom testified he asked to have in-person visits with J.P. "a couple times" after his release, but Adams did not arrange any visits. Malcom testified he did not have a relationship with J.P. because he was not able to visit him.

¶ 15 The trial court took the matter under advisement and continued the matter until December 16, 2025. At the subsequent hearing, the court found Malcom failed to maintain a reasonable degree of interest, concern, or responsibility as to J.P.'s welfare, and he failed to make reasonable progress toward J.P.'s return home during the specified nine-month period. The court found Adams's testimony to be credible and supported by the admitted exhibits. The court observed Malcom was asked to cooperate with DCFS, complete domestic violence services, parenting classes, substance abuse and mental health assessments, along with any recommended services based on those assessments, and comply with drug testing. The court emphasized, "[Malcom] failed to attend or complete any requested service."

¶ 16 B. Best-Interests Hearing

¶ 17 The matter proceeded to a best-interests hearing. The record shows Malcom attended the hearing via Zoom, rather than in person, because he traveled out of the state for a family member's funeral.

¶ 18 Adams testified J.P. recently turned two years old. He and his three siblings were all placed with the same foster family in September 2024, and they had been there for over a year. Adams testified the children had "a good attachment" with their foster parents and "routinely refer[red] to them as mom and dad at this point." J.P. had "blossomed" and "flourished" during his time with his foster parents, and Adams described him as "very engaging *** , very friendly, [and] very funny." J.P. enjoyed doing "[w]hatever his brothers are doing,"

including wrestling and playing with action figures. J.P. liked Spiderman a lot, and he was "always asking for snacks" because "[h]e loves food." J.P. did not have any developmental needs, but his foster parents were supportive and engaged as they helped with J.P.'s older brother's developmental and academic needs. J.P.'s foster parents were willing to facilitate relationships between J.P. and his biological parents if it was safe and appropriate to do so. J.P.'s foster parents had "suitable income to meet [the children's] needs," as well as a two-story house with a finished basement and four bedrooms, which provided "plenty of room" for the children. J.P.'s foster parents wished to adopt him and his siblings, and DCFS had no concerns about their ability to parent the children safely. Adams believed it was in J.P.'s best interests to terminate Malcom's parental rights so J.P.'s foster parents could adopt him.

¶ 19          According to Adams, J.P. did not have any relationship with Malcom. Malcom had not had any visits with J.P. since the last court date. Adams scheduled another child and family team meeting with Malcom, but he arrived half an hour late. By that time, Adams was in another meeting and could not conduct a child and family team meeting with Malcom. Malcom had not started any classes or completed any services since the previous hearing.

¶ 20          The trial court found the State had met its burden and granted its petition to terminate Malcom's parental rights. The court found J.P. had been in "a very safe, loving, caring, supportive home" with his siblings for more than a year. J.P. and his siblings were "flourishing in this home." While J.P. did not require special developmental attention, his foster parents made sure to address the academic and developmental needs of his siblings. Adams, the guardian *ad litem*, and the court-appointed special advocate frequently visited the foster parents' home, and none of them raised any concerns regarding the foster parents' ability to parent J.P. and his siblings. The court asserted the children had strong attachments to their foster parents and to each

other. J.P. and his siblings referred to their foster parents as "mom and dad." The court emphasized the foster parents provided "a safe and loving environment" for the children, where "they have a sense of belonging" and "their identities and unique personalities are growing and developing."

¶ 21 Conversely, Malcom did not have a meaningful relationship with J.P. During the three months after his release, he failed to attend the first child and family team meeting and arrived half an hour late for the second. At the time of the hearing, Malcom had not met J.P. in person. The trial court observed Malcom reportedly attended two different funerals out of town, and thus could "get to places for which he finds a need or a purpose," but he had not prioritized the meetings necessary to begin in-person visits with J.P. The court found Malcom failed to demonstrate any interest in engaging in services. The court granted the State's petition and terminated Malcom's parental rights.

¶ 22 This appeal followed.

¶ 23 II. ANALYSIS

¶ 24 In February 2026, Malcom's appointed appellate counsel filed a motion seeking leave to withdraw as counsel. Malcom did not file a response. Counsel asserts no arguably meritorious issue can be raised on appeal. We agree.

¶ 25 A. Standard of Review

¶ 26 To terminate an individual's parental rights, the State must first show the parent is unfit by clear and convincing evidence and then show that terminating their parental rights serves the child's best interests by a preponderance of the evidence. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002); *In re D.T.*, 212 Ill. 2d 347, 366 (2004). "The trial court is given broad discretion and great deference in matters involving minors." *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). We

will not reverse an unfitness finding unless it is against the manifest weight of the evidence, as such a determination "involves factual findings and credibility determinations that the trial court is in the best position to make." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. Likewise, we will not reverse a best-interests finding unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. "A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 48.

¶ 27                                B. Unfitness Finding

¶ 28          The Adoption Act provides several grounds on which a trial court may find a parent unfit. See 750 ILCS 50/1(D) (West 2024). Those grounds include a parent's failure to (1) "maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare" and (2) "make reasonable progress toward the return of the child *** during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(b), (m)(ii) (West 2024). In determining whether a parent has demonstrated a reasonable degree of interest, concern, or responsibility for a child's welfare, we view their conduct "in the context of the circumstances in which it occurs." *In re S.C.-G.*, 2025 IL App (1st) 241168, ¶ 51. We will consider "the parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, including inquiries into the child's welfare." *S.C.-G.*, 2025 IL App (1st) 241168, ¶ 51. "[R]easonable progress" means "measurable or demonstrable movement toward the goal of the return of the child." *In re L.L.S.*, 218 Ill. App. 3d 444, 460-61 (1991). We have previously described "reasonable progress [a]s an objective standard," measuring whether "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstratable and of such a quality that the court, in the *near future*, will be able to order the

- 8 -

child returned to parental custody." (Emphasis in original and internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88.

¶ 29 There is no issue of arguable merit concerning the trial court's unfitness finding. The evidence supports the court's determination that Malcom failed to (1) maintain a reasonable degree of interest, concern, or responsibility for J.P.'s welfare and (2) make reasonable progress toward J.P.'s placement with him during the nine months from November 29, 2024, through August 29, 2025. See 750 ILCS 50/1(D)(b), (m)(ii) (West 2024). DCFS recommended that Malcom, *inter alia*, complete domestic violence counseling, a substance abuse assessment and any recommended treatment, and a mental health assessment and any recommended treatment. At no point during the case's pendency did Malcom complete any recommended services. After his release, Malcom failed to appear at both of his scheduled drug tests. Malcom was required to attend a child and family team meeting with Adams before he could begin visiting J.P. in person, but he failed to attend the first meeting and arrived half an hour late to the second meeting. He was so tardy that Adams needed to attend another meeting and could not facilitate a child and family team meeting with Malcom. When the best-interests hearing occurred three months after Malcom's release, he still had not satisfied this necessary requirement to meet J.P. in person. Malcom did not send any gifts or letters to J.P. during the case. Malcom was able to find transportation to two different out-of-town funerals at different points during the case, but he repeatedly encountered transportation issues when he needed to appear for scheduled drug drops or child and family team meetings. Because the opposite conclusion is not clearly evident, we cannot say the trial court's unfitness finding was against the manifest weight of the evidence. *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011).

¶ 30 C. Best-Interests Determination

¶ 31 Once a trial court finds a parent unfit, it must consider whether terminating their parental rights serves the child's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364 (2004). When considering whether termination of parental rights serves a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2024). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006).

See 705 ILCS 405/1-3(4.05) (West 2024).

¶ 32 There is no issue of arguable merit regarding the trial court's best-interests finding. J.P. was two years old at the time of the best-interests hearing, and he had been living with his foster parents for more than a year. J.P. was placed in the same foster home as his siblings, all of whom referred to their foster parents as "mom and dad." Adams testified J.P. showed a "good attachment" to his foster parents, and he had "blossomed" and "flourished"

during his time with them. J.P. had begun to develop his identity, and Adams described J.P. as "very engaging \*\*\*, very friendly, [and] very funny." J.P. enjoyed Spiderman, wrestling with his siblings, and playing with action figures. Although J.P. did not have any unique developmental needs, Adams testified J.P.'s foster parents ensured J.P.'s sibling's developmental needs were met. It would be reasonable to conclude the foster parents would do the same for J.P. if such a need arose. The court found that J.P.'s foster parents provided "a safe and loving environment" for the children, where J.P. and his siblings "have a sense of belonging" and "their identities and unique personalities are growing and developing." J.P.'s foster parents were willing to provide him and his siblings with permanency by adopting them.

¶ 33　　　　Conversely, Malcom had no relationship with J.P., notably underscored by Malcom's failure to appear on time for a child and family team meeting, which was a prerequisite for him to begin in-person visits with J.P. When the trial court conducted the best-interests hearing, Malcom had not yet met J.P. in person.

¶ 34　　　　Based on this evidence, the trial court determined it was in J.P.'s best interests to terminate Malcom's parental rights. We cannot say "the opposite conclusion is clearly apparent" from the record, nor can we find the court's decision to be "unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 35　　　　　　　　　　　　III. CONCLUSION

¶ 36　　　　We agree with appointed appellate counsel this appeal presents no issue of arguable merit. Accordingly, for the reasons stated, we grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 37　　　　Affirmed.