2025 IL App (1st) 250318-U

No. 1-25-0318

Third Division
December 10, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* S.B. and R.B., | ) | Appeal from the Circuit Court |
|     Minors-Appellees | ) | of Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | Nos.   20 JA 168 |
| | ) |           20 JA 169 |
| v. | ) | |
| | ) | The Honorable |
| Keith B., | ) | Andrea Buford, |
|     Father-Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Martin and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Affirming the circuit court findings that (1) the natural father was unfit where the State established his failure to maintain a reasonable degree of interest, concern, or responsibility as to his children's welfare, and (2) termination of his parental rights was in the best interests of the minor children.

¶ 2    Respondent Keith B. is the natural father of twin minors S.B. and R.B. (twins), born in 2018. In a 2021 order, the circuit court adjudicated the twins and their older sister, A.S.[1] (born

---

[1] A.S. is not a party to this appeal.

to a different natural father), to be abused and neglected. A termination hearing was held on January 22, 2025, during which the circuit court found respondent unfit pursuant to section 1(D)(b), (m), and (s) of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2024)) and found that termination of parental rights served the best interests of the twins. The circuit court terminated respondent's parental rights (along with the twins' natural mother's) and appointed a guardian with the right to consent to adoption by the twins' paternal aunt and her wife, with whom the twins have resided since infancy.

¶ 3        Respondent argues on appeal that the circuit court's findings of parental unfitness and that termination was in the twins' best interests are against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 4                                   BACKGROUND

¶ 5        The minors in this appeal are twin sisters S.B. and R.B., born to natural mother Amanda C. (A.C.) and natural father (respondent) Keith B. on December 20, 2018. At the time of the twins' birth, A.C. was a resident of Haymarket Center, a drug and alcohol treatment facility in Chicago. She was diagnosed with bipolar disorder and depression. The twins were born premature with respiratory issues and substance exposure leading to withdrawal, and A.C. admitted to using heroin on at least two occasions during her pregnancy. A.C. also reported to the Department of Children and Family Services (DCFS) that respondent had acquired the heroin for her.

¶ 6        DCFS initially offered intact family services, but in January 2020 the State filed petitions for adjudication of wardship which alleged that A.C. had continued to test positive for drugs. The petitions also alleged that the twins' teenage half-sister, A.S., was 22 weeks pregnant and required mental health treatment after hospitalization for a suicide attempt in

2019, and that A.C. had failed to comply with previous DCFS and police investigations and neglected to provide an adequate care plan for her teenage daughter following her psychiatric hospitalization. The petitions further alleged that A.C. allowed her teenage daughter to reside with the 33-year-old father of the teen's child. Citing these factors, the petitions alleged probable cause that the twins were neglected and abused pursuant to sections 3(1)(b) and 3(2)(ii) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3 (West 2020)) and that there was an immediate and urgent necessity to place the twins in temporary custody pursuant to section 10 of the same statute (705 ILCS 405/2-10 (West 2020)). The petitions listed respondent, who was then incarcerated at the Illinois Department of Corrections (IDOC), as the father of the twins but noted that paternity had not yet been established.

¶ 7        The day when the petitions were filed the circuit court conducted a temporary custody hearing and found probable cause that the twins were abused and neglected. The circuit court also found that DCFS had made reasonable efforts to prevent or eliminate the necessity of removing the twins from their home but the immediate and urgent necessity for removal had not been eliminated. The circuit court granted temporary custody with the right to consent to major medical care and placement authority to the DCFS guardianship administrator. As paternity had not yet been established, respondent was not provided notice, and therefore he was not present at the hearing.

¶ 8        Respondent first filed an appearance on February 25, 2020, and the circuit court ordered paternity testing. In March 2020, respondent was released from IDOC and placed on parole. On September 22, 2020, a finding regarding paternity established respondent as father to the twins. The circuit court then ordered DCFS to evaluate respondent and establish plans for services and supervised visitation.

¶ 9                          *Adjudicatory and Dispositional Hearings*

¶ 10          An adjudicatory hearing occurred on February 16, 2021. The circuit court found the State had satisfied its evidentiary burden with respect to the allegations of neglect due to injurious environment and abuse due to a substantial risk of physical injury. See 705 ILCS 405/2-3(1)(b), 2-3(2)(ii) (West 2020). The circuit court noted that A.C. gave birth to substance-exposed infants, was in substance abuse treatment, and later relapsed. The circuit court order also noted that A.C.'s teenage daughter had bruises on her body purportedly caused by the 33-year-old alleged father of her child with whom her mother had allowed her to cohabitate.

¶ 11          The matter immediately proceeded to a dispositional hearing. The State introduced a witness, Dorian Moore (Moore), a case manager at Unity Parenting and Counseling (Unity), who testified that respondent had been assessed and referred for parenting classes and individual therapy, that he was engaged and consistent in his attendance of these services, and that he was making progress. Moore recommended that respondent's visitations increase from weekly to twice weekly. On cross-examination, Moore expressed that respondent had fully cooperated with Unity regarding services and visitations.

¶ 12          The circuit court adjudicated that the twins be made wards of the court as A.C. was unable to care for them. The circuit court appointed the DCFS guardianship administrator as guardian and stated that the twins would remain in the care of their paternal aunt and her wife. The circuit court also ordered that respondent's visitations be increased.

¶ 13          The circuit court set a permanency goal of return home within five months for the twins.

¶ 14                                    *Subsequent Permanency Proceedings*[2]

¶ 15          After a March 8, 2022, permanency hearing, the circuit court noted that A.C.'s whereabouts were unknown (a witness from Unity testified that A.C.'s whereabouts had been unknown since approximately November 2021) and that respondent was "in the process of completing services." The circuit court entered a permanency goal of return home within 12 months.

¶ 16          On January 12, 2023, the circuit court held another permanency hearing and entered an order reiterating the goal of return home within 12 months. The order also provided that respondent had "outstanding services and will begin unsupervised day visits and transition to unsupervised overnights." According to the permanency hearing transcript, "outstanding services" referred to parenting coaching, for which respondent had been recommended the day before the hearing but had not yet had the opportunity to complete. The circuit court acknowledged that respondent had otherwise completed his required services, and there were no problems with his visitations with the twins. The court observed that respondent was bonding with his daughters.

¶ 17          At the following permanency hearing conducted on September 13, 2023, a Unity caseworker, Latjuan Richie (Richie), testified as to a court report she had prepared on

---

[2] We acknowledge that the evidence presented at these proceedings and any other pre-termination proceedings, some of which respondent relies upon in his arguments on appeal, cannot be considered in our review of the trial court's unfitness determination. See *In re Dar. H.*, 2023 IL App (4th) 230509, ¶¶ 46-49 (holding that since the evidentiary rules governing permanency hearings are less rigid than those of fitness hearings, the evidence and orders from permanency hearings may not be considered by a trial court in determining unfitness for termination proceedings, and a reviewing court will not reverse an unfitness determination based on any other evidence than the fitness hearing itself). As respondent has also challenged the best interest finding of the termination order, however, we note that any orders and evidence from the permanency hearings may be considered in the best interest portion of the termination proceeding, and any such evidence relied upon in the circuit court's best interest decision may also be considered in our review. See *In re M.D.*, 2022 IL App (4th) 210288, ¶ 76.

September 5, 2023, which stated that respondent's visitation with the twins had been suspended due to an allegation of abuse or neglect made on August 13, 2023. The report stated that respondent was not currently enrolled in any services. The court report further stated that respondent was previously enrolled in substance abuse services due to another indicated report from April 2023, but he had not completed those services after the April 2023 report was determined unfounded. According to Richie's testimony, the August 13, 2023, allegation concerned an incident involving the 12-year-old son of respondent's then-girlfriend which had resulted in a police report. Richie also testified that respondent had failed to submit urine samples for random drug screening for "about a month." She testified that respondent's previous screenings since she had been assigned to his case were negative. Unity recommended a new permanency goal of substitute care pending termination of parental rights. In its report, Unity further recommended that respondent complete an inpatient substance abuse program, anger management classes, and domestic violence classes.

¶ 18       At the permanency hearing, the circuit court encouraged respondent to complete these services to avoid the risk of termination, and commended him on the progress he had made prior to the August 13 incident, noting that respondent "did a lot of work and he's bonded to his children." The circuit court ordered reinstatement of respondent's supervised visits and mediation between respondent and his sister (the twins' foster mother) to resolve "family issues" affecting visitation.

¶ 19        Respondent was indicted for murder and placed in pretrial detention in December 2023. At a March 27, 2024, permanency hearing, Dr. Gabrielle Joseph (Joseph), assistant director for Unity, testified that respondent was in pretrial detention and had not completed the services recommended in the September 2023 report. Respondent proceeded to testify,

expressing appreciation for the care and love his sister and her wife had shown the twins. Respondent also expressed his frustrations with Unity due to difficulties communicating with agency workers and his view that they "lie a lot" and "don't help people." The circuit court then changed the permanency goal due to Unity's recommendation of substitute care pending court determination on the termination of parental rights. Joseph testified that respondent frequently spoke to the twins over the phone and Zoom video call. Respondent's sister also testified that she and her wife would continue to accept visits and phone calls between respondent and the twins.

¶ 20                    *Termination Proceedings and Nine-Month Pleadings*

¶ 21          On July 8, 2024, the State filed supplemental petitions for appointment of a guardian with the right to consent to adoption. In the petitions, the State alleged that respondent was unfit pursuant to sections 1(D)(b), (c), (m), and (s) of the Adoption Act (grounds (b), (c), (m), and (s)). Ground (c) was later withdrawn as to respondent.[3]

¶ 22          On September 19, 2024, the State filed a notice identifying three nine-month periods following the adjudication order during which respondent had allegedly failed to make reasonable efforts to correct the conditions that formed the basis for removal or failed to make reasonable progress towards the twins' return home. See 750 ILCS 50/1(D)(m) (West 2024). This notice was served on respondent's counsel and contained the correct caption for the twins' cases, but the text of the pleading erroneously identified an individual, D.R., as the party being provided notice rather than respondent.[4] The notice identified the following nine-month

---

[3] The State also alleged that A.C. was unfit on grounds (b), (c), (m), and (n) of the Adoption Act. A.C. was defaulted on September 4, 2024, for failure to appear after notice by publication.

[4] We note that D.R. is not a party in this appeal.

7

periods: (1) August 17, 2022, to May 17, 2023; (2) May 17, 2023, to February 17, 2024; and (3) January 7, 2024, to October 7, 2024.

¶ 23            The State filed an amended pleading regarding the nine-month periods on January 14, 2025. It again served respondent's counsel and contained the correct caption for the twins' cases but mistakenly referenced the same uninvolved individual, D.R., in the text of the pleading rather than respondent. In this amended pleading, the State identified the time period of January 1, 2023, to October 31, 2023, as the nine-month period it would rely upon for its ground (m) unfitness allegations.

¶ 24            The State filed a third pleading on January 17, 2025, which listed the four previously identified nine-month periods together as the time periods relied upon for its allegation of respondent's unfitness pursuant to ground (m). This last filing correctly identified respondent in the text of the pleading.

¶ 25            The termination hearing was held on January 22, 2025. The State called two caseworkers from Unity, Latjuan Richie and Rodney Lewis, as witnesses to testify as to respondent's unfitness. Before direct examination, the State moved for leave to withdraw without prejudice ground (c), "[d]esertion of the child for more than 3 months next preceding the commencement of the Adoption proceeding," for respondent. *Id.* § 1(D)(c). The circuit court took judicial notice of the adjudication evidence and findings, disposition, default of A.C., and termination petition. The State also requested the circuit court take judicial notice of the January 17, 2025, and September 19, 2024, nine-month pleadings and respondent's certified conviction from April 23, 2019, for attempted possession of a stolen motor vehicle and aggravated driving while under the influence. Respondent's counsel objected to the inclusion of the September 19, 2024, nine-month pleading which had erroneously named an

uninvolved individual D.R. rather than respondent, and the circuit court excluded the pleading. Respondent's counsel also objected to the admission of respondent's certified conviction based on relevance and prejudice, and the State argued that it was relevant for ground (s), which pertains to a parent's unfitness due to incarceration at the time of the termination proceedings and a previous history of repetitive incarceration which has impeded the discharge of parental responsibilities. The circuit court accepted this argument and admitted the certified conviction into evidence.

¶ 26    The circuit court also admitted into evidence an integrated assessment report from January 29, 2020, detailing the circumstances surrounding the twins' birth and the opening of this case. Lastly, the circuit court admitted into evidence a service plan from April 2024 for respondent which indicated that he had completed parent coaching, parenting classes, and individual therapy, and that he was consistent with visitations and completing random drug screenings. The service plan further indicated that respondent had previously completed a substance abuse assessment and services but was reenrolled following his indicated report for neglect.

¶ 27    Richie testified that she was assigned as caseworker on the twins' case with Unity from January to October 2023. She testified that she had contact with respondent and he was assessed for services, and that he had already completed several services by the time she joined the case. Richie initially referred respondent for individual therapy and substance abuse treatment, both of which he completed. She testified that respondent commenced unsupervised visits with the twins in April 2023, but these visits were suspended in May 2023 due to a positive drug screening. After the positive screening in May, respondent failed to complete the random drug screenings that Richie had assigned for him through October 2023. She further

testified that in May or June respondent assured her during a phone call that he would enroll in a substance abuse treatment program, but he had neither enrolled nor completed a new substance abuse assessment by the time she left Unity in October 2023. Richie testified that respondent did not to her knowledge send any "cards, gifts, or letters" to the twins after his unsupervised visits were suspended, nor did respondent contact her to schedule supervised visits with the twins at any point thereafter.

¶ 28        Richie also testified to a subsequent investigation involving respondent. In this incident, respondent, while driving under the influence of alcohol, allegedly abandoned his girlfriend's minor son in an unsafe neighborhood. Based on this investigation, DCFS issued an indicated finding and Richie requested that respondent be reassessed for services, as "it was a youth involved; and he [respondent] was in the process of getting his children[.] *** I wanted to insure [*sic*] that these children were safe if and when they were around [respondent]." Richie testified that she did not receive any response to her attempts to contact respondent after the June 2023 phone call in which respondent indicated he would enroll in substance abuse treatment.

¶ 29        On cross-examination, counsel for respondent questioned Richie's testimony as to the start date of respondent's unsupervised visits. Richie testified that she supervised some visits between respondent and the twins, and that those visits were safe and appropriate. Richie observed a bond between respondent and the twins, and she testified that she had no concerns regarding respondent's parenting abilities during the visits.

¶ 30        The State then called Rodney Lewis (Lewis), who had been assigned to the twins' case as a caseworker at Camelot Care Center (Camelot) from June 2024 through October 2024. Lewis testified that, during his time on the case, he did not have direct contact with respondent,

as respondent was in pretrial detention and Lewis's attempts to reach him through the Cook County Department of Corrections and respondent's counsel were unsuccessful. Lewis testified that, to his knowledge, respondent entered pretrial custody around December 2023 and did not yet have an estimated release date. Lewis did not know if respondent attempted to send cards, gifts, or letters to the twins, but he testified that respondent had regular phone calls with the twins and their foster mothers.

¶ 31        The State requested that the circuit court make a finding of parental unfitness for respondent on grounds (b), (m), (n), and (s) of the Adoption Act.[5] The State acknowledged that respondent had "completed some services," including substance abuse services, but after completing those services he tested positive for substances and did not complete further drug testing. Additionally, the State acknowledged that respondent had completed parenting classes and "made some significant progress," as indicated by the circuit court's authorization of unsupervised visits, but that progress was curtailed after less than a month when respondent's unsupervised visits ended due to the report involving his girlfriend's son. The State also argued that respondent's lapse of communication with Unity after that suspension demonstrated a lack of interest and failure to make reasonable efforts towards reunification, and that respondent's subsequent arrest and detention "show[ed] a lack of concern for the children's well-being." Pointing to respondent's 2019 conviction, for which respondent was sentenced to three years in IDOC, the State argued that respondent was "behaving in a way that he could be incarcerated where he is not able to take responsibility for his girls, *** [and] he has a history of being incarcerated and unable to care for his daughters for longer periods."

---

[5] The State also requested that the court find unfitness for A.C. on grounds (b), (c), (m), and (n) of the Adoption Act.

¶ 32    The public guardian reiterated the State's argument that despite "start[ing] out on the right track," respondent had fallen short in proving himself as a capable parent to the twins after he made a "wrong turn." The public guardian argued, "the services that he completed were negated by his behavior, by his arrests, by his positive drug drops; and he never got back on track to complete those services and reengage in his children's lives." The public guardian then requested that the circuit court find both parents unfit.

¶ 33    Counsel for respondent argued that the State had not met the required burden of "clear and convincing evidence" for a finding of parental unfitness. Counsel emphasized respondent's completion of most services required of him and the appropriateness of respondent's visits with the twins. Further, counsel for respondent argued that the State had specifically not satisfied its burden of proof for unfitness for ground (s), which requires a history of repeated incarceration as a result of criminal convictions, as the State had only submitted one criminal conviction for respondent, and he had not yet been convicted on the charges resulting in his current incarceration. Counsel further argued that the witnesses' testimony concerning respondent's noncompliance with and performance on random drug tests was inadmissible hearsay.

¶ 34    The State argued in turn that respondent's singular conviction submitted as evidence was indeed sufficient to form a basis for ground (s) unfitness, citing *In re E.C.*, 337 Ill. App. 3d 391, 399-400 (2003), and *In re B.W.*, 309 Ill. App. 3d 493, 499 (1999).

¶ 35    The circuit court found the State satisfied its burden by clear and convincing evidence with respect to grounds (b), (m), and (s) for respondent.[6] The circuit court ruled:

---

[6] The court found unfitness for A.C. on grounds (b), (c), (m), and (n).

"[Respondent] has failed to maintain a reasonable degree—no; I'm—that he has deserted his children for more than three months next preceding the commencement of these termination proceedings. He has failed to make reasonable efforts to correct the conditions or reasonable progress towards the return of the children to him; and he has evidenced an intent to forego [*sic*] his parental right by a failure for a period of twelve months to visit with, communicate with, or maintain contact with or plan for the future of the children. *** [Respondent] had completed the bulk of his services and had advanced on unsupervised visits at least of a period of a month. His visits were stopped about May of 2023 when he tested for substances and failed to take any of the scheduled or requested urine drops. He also had a previous Indicated Report.

He has not sent any cards, gifs [*sic*], or letters during this time. Consequently[,] he was previously convicted and incarcerated and subsequently arrested again and is currently incarcerated and unable to care for his children."[7]

¶ 36    The circuit court expressed to respondent that he was at one point "so, so close" to reunification and inquired whether respondent, his sister, and her wife (the twins' foster mothers) had gone to mediation to work out an alternative solution. The public guardian responded that the foster mothers "are open but they want to adopt."

¶ 37    The circuit court then proceeded to the best interest hearing, taking judicial notice of the unfitness findings.

¶ 38    The State called Tiayla Miller (Miller), current caseworker for the twins at Camelot. Miller testified that she had been assigned to the twins' case since December 13, 2024, and

---

[7] Some of the language in the court's ruling corresponds to grounds (c) and (n) of the Adoption Act, but when prompted by the public guardian the court later clarified that it had found unfitness for respondent based on grounds (b), (m), and (s).

13

that her agency was recommending termination of parental rights. Miller testified that she did not know why Camelot was recommending termination, but she had briefly visited the twins in their foster mothers' home and observed that they were bonded and that the foster mothers wanted to adopt. On cross-examination by respondent's counsel, Miller testified that she had been on leave from Camelot from the week after she was assigned to the twins' case through January 6, 2025. Miller further testified that guardianship had not been discussed as an alternative to termination, and she did not know why it had not. She was also unsure if permanency options had been discussed with the twins themselves. Miller testified that she had observed the twins on one occasion, for approximately an hour, and she had not contacted their school to inquire into their progress there.

¶ 39    The public guardian then called to the stand respondent's sister and the twins' foster mother, W.B. W.B. testified that the twins had lived with her "[s]ince the day they came home from the hospital," that she and her wife provided for all of the twins' needs, and that she and her wife were both interested in adopting the twins rather than continuing with guardianship. W.B. testified that she and her wife "would like to get the girls some stability to let them know that they're safe and that they have a home." According to W.B.'s testimony, the twins referred to her as "Ma," "Nanna," "Mo Mo," "Nanny," and "Mama," and they referred to her wife as "Mama [name omitted]." When questioned over whether she would allow continued contact between the twins and respondent after termination of his parental rights, W.B. answered, "Always. He's my brother. That would not change."

¶ 40    On cross-examination by respondent's counsel, W.B. testified that she adds funds to respondent's phone account so that he can call when he wanted. W.B. testified that she and

respondent talk often, either daily or every other day, and he speaks with the twins once to three times a week. W.B. testified that the conversations with respondent were appropriate.

¶ 41    Respondent then took the stand. He testified as to his desire to retain parental rights and maintained his innocence as to the criminal charges pending against him. With respect to his sister, respondent testified:

> "I don't mind helping my sister. I would love for us to be able to co-parent. *** [M]y sister has been a big support for me. I'm not going to take—her and her wife have been a big support to me. I'm not going to have her do that for—I just want to be with my kids. *** I don't ever want to ever lose contact with my kids."

¶ 42    On cross-examination, respondent testified that he was incarcerated in IDOC when the twins were born. He testified that he was currently charged with murder with an upcoming trial date on January 28, 2025, and that he did not yet have an anticipated release date.

¶ 43    The circuit court ruled that termination was in the twins' best interests "based upon the unfitness findings including the fact that the mother was defaulted; the father is incarcerated for murder; has not gone to trial yet; and has no anticipated release date." The circuit court emphasized the twins' bond with their foster mothers and that their foster home was the only placement they had known. The circuit court also observed respondent's apparent love for the twins, as well as his apparent trust in his sister's capacity to take good care of them. The circuit court found that the "girls deserve permanency," and the appropriate goal was adoption.

¶ 44    A permanency order filed the same day listed the achievement date for the permanency goal of adoption as July 22, 2025.

¶ 45    Respondent filed this timely appeal on February 19, 2025.

¶ 46                                            ANALYSIS

¶ 47          Respondent argues on appeal that the circuit court erred in finding that he was unfit pursuant to grounds (b), (m), and (s) of the Adoption Act and that parental termination was in the twins' best interests. The public guardian argues for affirmance of the circuit court's ruling as to grounds (b) and (m) for unfitness and the best interest determination but does not request that this court affirm the circuit court's unfitness finding on ground (s), arguing that an affirmance on any singular unfitness ground is sufficient and the evidence for grounds (b) and (m) weighs against respondent. The State concurs with the public guardian's arguments in favor of affirmance.

¶ 48          As a preliminary matter, we observe that this is an accelerated appeal pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), which addresses the disposition of child custody and related appeals. Rule 311(a)(5) provides that an appellate court shall issue its decision within 150 days after the filing of the notice of appeal "[e]xcept for good cause shown." *Id.* As the notice of appeal was filed on February 19, 2025, the 150-day period would have typically expired on July 21, 2025. Respondent, however, requested and was granted an extension of time for filing his opening brief. Appellees also requested and were granted three extensions of time for filing response briefs. Respondent's reply brief was filed on October 6, 2025. Since this case as a result was not ready for disposition until October 6, 2025, we find that good cause is shown for the delay in filing this order. See *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 26; *M.D.*, 2022 IL App (4th) 210288, ¶¶ 47-49.

¶ 49          The procedure for termination of parental rights derives from the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2024)). After a minor is adjudicated abused, neglected, or dependent and the State seeks

termination of parental rights to enable the minor's adoption, termination proceeds with a two-step process: first, a demonstration based on clear and convincing evidence that the parent is "unfit" according to one or more grounds enumerated in the Adoption Act, and second, a determination of whether termination is in the minor's best interests. 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d 347, 352 (2004).

¶ 50　　　　The standard of review for both the unfitness and best interest determinations is the manifest weight of the evidence standard—that is, a reviewing court will not reverse the circuit court's findings unless they are against the manifest weight of the evidence in the record. *In re L.G.*, 2025 IL App (1st) 241464, ¶ 28; *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. Although some courts have applied an abuse of discretion standard for review of the best interest determination in parental termination cases, the Illinois Supreme Court in *D.T.*, 212 Ill. 2d at 357, clarified that evidentiary rulings during the best interest hearing are the only decisions in these proceedings subject to the more deferential abuse of discretion standard of review. By contrast, "a trial judge's ruling on the ultimate issue at a best-interests hearing—whether the parent-child relationship should be permanently and completely severed—is plainly not the type of ruling to which the highly deferential abuse of discretion review traditionally applies." *Id*. Instead, consistent with review of unfitness determinations, the "ultimate decision to terminate respondent's parental rights" likewise requires application of a manifest weight standard. *In re Tiffany M.*, 353 Ill. App. 3d 883, 892 (2004).

¶ 51　　　　A circuit court's decision is against the manifest weight of the evidence if it is "unreasonable, arbitrary, or based on something outside of the record," or if the opposite conclusion is "clearly evident" from the record. *L.G.*, 2025 IL App (1st) 241464, ¶ 28. It is a deferential standard, and a reviewing court cannot "reweigh the evidence or reassess the

credibility of the witnesses." *J.H.*, 2020 IL App (4th) 200150, ¶ 68; *In re D.M.*, 336 Ill. App. 3d 766, 773 (2002).

¶ 52     This appeal involves a finding of unfitness that is disputed based on two grounds from the Adoption Act: ground (b)—failure to maintain a reasonable degree of interest, concern, or responsibility regarding the minor's welfare; and ground (m)(ii)—failure to make reasonable progress toward the minor's return during any nine-month period following the adjudication order. 750 ILCS 50/1(D)(b), (m)(ii) (West 2024). A reviewing court may affirm a circuit court's finding of unfitness based on any one of the grounds set forth in section 1(D) of the Adoption Act. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006); *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

¶ 53     For ground (b), the disjunctive "or" in "interest, concern, or responsibility" indicates that failure based on any of the three qualities can form the grounds for a finding of unfitness. *In re D.D.*, 2022 IL App (1st) 220410, ¶ 73. In assessing a parent's fitness under the criteria for ground (b), the court considers the full context of circumstances which may affect the parent's demonstration of a reasonable degree of interest, concern, or responsibility regarding the minor's welfare. *In re S.C.-G.*, 2025 IL App (1st) 241168, ¶ 51. For instance, where in-person visits are impeded through circumstances such as incarceration, the court may consider whether the parent has maintained a reasonable degree of interest or concern through transmission of phone calls, letters, and gifts. *Id.* ¶¶ 51, 54. Completion of service plan objectives can also be indicative of a parent's interest, concern, or responsibility. *Id.* ¶ 51; *Daphnie E.*, 368 Ill. App. 3d at 1065. The court's inquiry should focus on the parent's reasonable efforts rather than their success. *D.D.*, 2022 IL App (1st) 220410, ¶ 74; *S.C.-G.*, 2025 IL App (1st) 241168, ¶ 51.

¶ 54　　　　Briefly, we address respondent's argument that the circuit court misspoke in including ground (b) in its unfitness ruling. Respondent maintains that "the court first explicitly rejected [the ground (b) finding] in its oral ruling before subsequently listing it in its grounds a short time later, with no explanation for the change." Indeed, in stating its oral ruling, the circuit court appeared to state the beginning of the ground (b) requirements before interrupting itself and proceeding to recite language from ground (c) of the Adoption Act, which attributes parental unfitness for "[d]esertion of the child for more than 3 months next preceding the commencement of the Adoption proceeding" (750 ILCS 50/1(D)(c) (West 2024)). The circuit court, however, later clarified that it was finding unfitness on grounds (b), (m), and (s) when prompted by counsel, who also reminded the court that grounds (c) and (n) had been withdrawn as applied to respondent ("Right; so I did (B), (M), and (S)"). Further, the circuit court's termination hearing order filed the same day as the hearing explicitly stated that respondent had been found unfit by clear and convincing evidence on grounds (b), (m), and (s) of the Adoption Act. As it is plainly evident from the hearing transcript and order that the circuit court meant to find respondent unfit based on grounds (b), (m), and (s), we do not observe any error in the circuit court's ruling on this ground.

¶ 55　　　　Even if the circuit court's initial misstatement in its unfitness ruling amounted to an error, respondent has failed to advance an argument for whether and how we should consider this mistake on appeal. As respondent failed to object to the circuit court's initial misstatement at the unfitness hearing, he would now need to advance an argument as to why we should nonetheless consider the unpreserved error under the plain-error doctrine on appeal pursuant to Illinois Supreme Court Rule 615(a) because either "the error alone threatened to tip the scales of justice against [respondent]" or that error is "so serious that it *** challenged the

integrity of the judicial process." *In re M.W.*, 232 Ill. 2d 408, 431 (2009) (internal quotation marks and citation omitted). Since respondent has not advanced such an argument and in fact does not cite any case law to support this point, we will not further consider it. See *id.* (respondent has the burden of persuasion on "both the threshold question of plain error and the question whether she is entitled to relief as a result of the unpreserved error"); Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("[a]rgument *** shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities"); see also, *e.g.*, *In re J.P.*, 331 Ill. App. 3d 220, 237 (2002) (declining review of claims for which respondent failed to "reference the record or cite to pertinent authority" and for which his argument "consists essentially of the bare assertion of the issue sought to be raised").

¶ 56        Respondent also argues that, regardless of whether the circuit court misspoke, the ground (b) ruling was against the manifest weight of the evidence as the record demonstrates respondent's consistent interest in the twins. Respondent cites his appearances at court proceedings despite his incarceration during the early stages of the case, his engagement in services upon release, and his consistent and appropriate visits—which at one point advanced to unsupervised visits—as demonstrable evidence of his maintenance of a reasonable degree of interest in the twins. Additionally, respondent argues that he would have had more visits, demonstrating more interest in the twins, had the DCFS agencies complied with the circuit court's directive at the September 2023 permanency hearing to "reinstate [respondent's] supervised visits at this point, as many as he can do in a week's time." This was after respondent had tested positive on a random drug screening in May 2023, resulting in a temporary suspension of his visits. However, the caseworker during that time, Latjuan Richie, testified that she communicated to respondent that his unsupervised visits would be reinstated

if he submitted to continued random drug screenings or enrolled in substance abuse treatment, and that in the meantime he was free to continue with supervised visits with the twins. Richie further testified that respondent failed to complete any supervised visits with the twins from May to October 2023, nor did he contact her or respond to her regular communications to resume visitation.

¶ 57    The circuit court also found in its unfitness ruling that respondent failed to send cards, gifts, or letters to the twins since May 2023. Though respondent had regular phone calls with the twins and their foster mothers, a court may also consider transmission of letters and gifts as evidence of a reasonable degree of interest for purposes of parental fitness. See *S.C.-G.*, 2025 IL App (1st) 241168, ¶¶ 51, 54. In reviewing this evidence in the aggregate, we do not find it unreasonable for the circuit court to have concluded that respondent failed to maintain a reasonable degree of interest in the twins' welfare, substantiating a finding of unfitness for respondent pursuant to ground (b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2024)).

¶ 58    Having established that the circuit court's ground (b) ruling was not against the manifest weight of the evidence, we affirm the circuit court's finding of parental unfitness for respondent. As such, we need not review the circuit court's ruling as to ground (m)(ii). See *Daphnie E.*, 368 Ill. App. 3d at 1064 ("[a] finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act"); *D.D.*, 196 Ill. 2d at 422 ("because parental rights may be terminated upon proof, by clear and convincing evidence, of a single ground for unfitness, we need not consider here whether [respondent] also was unfit because he failed to make reasonable progress pursuant to section 1(D)(m)").

¶ 59    Respondent also challenges as against the manifest weight of the evidence the circuit court's finding that termination of respondent's parental rights was in the twins' best interests.

21

The circuit court found in its ruling after the second half of the termination hearing: "[I]t is the best interests of the girls to terminate the rights of the parents based upon the unfitness findings including the fact that the mother was defaulted; the father is incarcerated for murder; has not gone to trial yet; and has no anticipated release date." The circuit court noted that the twins had been in their foster mothers' home since infancy, that they were bonded with their foster mothers, and that they "deserve permanency." Respondent argues this ruling was against the manifest weight of the evidence as the circuit court "evidenced no consideration of the best interest factors set forth in [section 1-3 of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024))]," and the circuit court "considered termination a forgone conclusion here as a result of [respondent's] pretrial detention."

¶ 60         The statutory factors from the Juvenile Court Act which circuit courts consider in making best interest determinations in parental termination proceedings include the following, which should be evaluated in the context of the minor's age and developmental needs: (a) the minor's physical safety and welfare; (b) the development of the minor's identity; (c) the minor's familial, cultural, and religious ties and background; (d) the minor's sense of attachments, including the least disruptive placement alternative for the minor and the minor's sense of familiarity, continued affection, security, and an actual feeling of love, attachment, and being valued; (e) the minor's own wishes and long-term goals, including regarding permanency options; (f) the minor's community ties; (g) the minor's need for permanence, including the need for stability and continuity in relationships with parental figures and other relatives; (h) the uniqueness of every child and family; (i) the risks related to substitute care; and (j) the preferences of the individuals available to care for the minor. 705 ILCS 405/1-3(4.05)(a)-(j) (West 2024). A circuit court may also consider the length and nature of a minor's

relationship with her current caretaker(s) and the potential effect changing that placement might have upon the minor's emotional and psychological well-being. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. No one statutory factor is determinative in the best interest analysis, and a circuit court need not articulate which factors it is relying upon in its best interest ruling. *L.G.*, 2025 IL App (1st) 241464, ¶ 37; *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. Once the finding of parental unfitness has been made, "the issue is no longer whether parental rights *can* be terminated," but rather "whether, in light of the child's needs, parental rights *should* be terminated." (Emphases added.) *D.T.*, 212 Ill. 2d at 364. Thus, in the circuit court's weighing of evidence for the factors which support a best interest finding, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.*

¶ 61        The circuit court did not specifically cite any factors from the Juvenile Court Act in delivering its ruling, but it emphasized factual details which directly correlated to those factors. These details included familial ties of the minors' foster mothers and their preferences for adoption, the twins' need for permanence and stability, the continuity provided through the twins' current home, and the twins' manifest attachments to their foster mothers and home environment. See 705 ILCS 405/1-3(4.05)(c), (d), (f), (g), (j) (West 2024). The circuit court's ruling also placed emphasis on the length and nature of the twins' relationship to their foster mothers (see *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19) and painted the picture of the stable, loving home they created (see *D.T.*, 212 Ill. 2d at 364). Although its citations to the statutory factors may not have been explicit, it is apparent that the circuit court appropriately weighed the statutory factors in making its best interest determination, and that determination therefore was not against the manifest weight of the evidence. Additionally, as the circuit court

duly considered the statutory best interest factors in its ruling, we observe no indication that respondent's pending criminal proceedings influenced the circuit court to find "termination a forgone conclusion," as respondent contends. See *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 32 (holding that "the full range" of a respondent's conduct may be considered at the second stage of a termination hearing, including the grounds for finding the respondent unfit when the circuit court has taken judicial notice of those findings) (quoting *In re C.W.*, 199 Ill. 2d 198, 217 (2002)).

¶ 62    For the reasons discussed above, the circuit court's findings that respondent was unfit pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2024)) and that termination was in the twins' best interests were not against the manifest weight of the evidence.

¶ 63                                  CONCLUSION

¶ 64    The judgment of the circuit court of Cook County is affirmed.

¶ 65    Affirmed.