2026 IL App (1st) 250968-U
Order filed: January 14, 2026

FIRST DISTRICT
THIRD DIVISION

No. 1-25-0968

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* M.H., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellee, | ) | Cook County |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | No. 18 JA 739 |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| F.H., | ) | Honorable |
| | ) | Jennifer Payne, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Martin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1   *Held*:  We affirm the orders of the circuit court finding the father unfit to parent his son, terminating his parental rights, and finding adoption was in the best interest of his son.

¶ 2   Respondent-appellant, F.H., appeals from the orders of the circuit court finding that he was unfit to parent his son M.H., born September 20, 2016, terminating his parental rights, and finding adoption was in the best interest of M.H. We affirm.

¶ 3        On August 7, 2018, the State filed a petition for adjudication of wardship against M.H.'s mother, C.B., and father, F.H., and a motion for temporary custody under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29 *et seq.*) (West 2018)). The State claimed that M.H. was neglected due to an injurious environment and being left without supervision for an unreasonable period of time in violation of sections 2-3(1)(b) and 2-3(1)(d) of the Juvenile Court Act and abused due to substantial risk of physical injury in violation of section 2-3(2)(ii) of the Juvenile Court Act. *Id.* § 2-3(1)(b), § 2-3(1)(d), and § 2-3(2)(ii). To support these claims, the State alleged that in July 2018, C.B. admitted to beating M.H.'s sister, Me. B., with a belt. Later in July, C.B. left M.H., Me. B., and another sibling, Ma. B., (collectively, the children) alone at home for over 30 minutes.

¶ 4        C.B., Me. B. and Ma. B. are not part of this appeal. F.H. is not the father of Me. B. and Ma. B. We previously affirmed the circuit court's decisions finding C.B. unfit and terminating her parental rights as to M.H. and Ma. B. in a summary order after C.B.'s appellate counsel filed a motion to withdraw. See *In re M.H. and Ma. B.*, No. 1-25-0799 (2025) (unpublished summary order under Illinois Supreme Court Rule 23(c)). We set forth the facts and procedural history with a focus on F.H. and M.H.

¶ 5        The motion for temporary custody of M.H. included the affidavit of Bridgett Jackson, an investigator for the Department of Children and Family Services (DCFS). Jackson averred that an individual who had recently cared for Me. B. discovered both old and new welts and marks to many different parts of her body. When the caretaker asked Me. B. how she received the injuries, she responded, "Mommy did it." C.B. admitted to spanking Me. B. with a belt and leaving a mark.

C.B. indicated that she did not want the children and wanted them to be adopted. When Jackson visited C.B.'s home, she found the children, aged three and under, in the home alone.

¶ 6     That day, the court entered orders which granted the State's motion for temporary custody, appointed the Cook County Public Guardian as the guardian *ad litem* (GAL) of M.H., and limited F.H. to supervised day visits with M.H.

¶ 7     On December 10, 2018, the court was informed that M.H. was placed with SOS Children's Village Home (SOS Children's) and was not in need of services. F.H. was looking for employment and without stable housing. He was visiting with M.H. The court entered an order finding that supervised day visits with F.H. were in the best interest of M.H. The court directed that unsupervised visits could begin after DNA results established F.H.'s paternity and DCFS determined that F.H. was not a danger to M.H. and the location where visits would take place is safe. By a January 28, 2019, court order, the court found F.H. to be M.H.'s father.

¶ 8     At a February 20, 2019, hearing, the court was informed that F.H. had undergone a mental health assessment and no services were recommended. The court directed that F.H. undergo an integrated assessment (IA).

¶ 9     On May 22, 2019, the case worker informed the court that M.H. was still in a foster home at SOS Children's. F.H. was inconsistent with visitations. The caseworker also stated that F.H. completed the IA and a Juvenile Court Assessment Program (JCAP) evaluation and had a negative drug test. He also participated in a child and family team meeting and had an appropriate visit with M.H. All other visits have occurred at the home of F.H.'s sister (the aunt). The court entered a visitation order allowing F.H. unsupervised day visits. He would be permitted supervised overnight visits only after the issue underwent a staffing and the location was approved.

¶ 10 The court, on July 10, 2019, held an adjudication hearing where a stipulation of facts (stipulation) was admitted into evidence. According to the stipulation, Jackson would testify that in July 2018, she was assigned to investigate a hotline call about the family. During a phone conversation, C.B. admitted that she struck Me. B. with a belt and left a mark across her back. Three weeks later, Jackson observed that Me. B. still had a mark in the middle of her back. In a later conversation, C.B. asked Jackson if DCFS handled adoptions. C.B. said she loved the children but was having a difficult time taking care of them and that their fathers were not helping.

¶ 11 Jackson went to the family's home on July 30, 2018, to conduct a well-being check but could not gain entrance. Jackson called C.B., who told her that she left the children alone while she went for a walk. Over 30 minutes later, C.B. returned and Jackson entered the home to find the children were without supervision. The children were placed with a caretaker under a safety plan, which was later terminated upon C.B.'s request. C.B., however, could not offer another viable caretaker. As a result, DCFS took protective custody of the children.

¶ 12 The stipulation also provided that F.H. "was non-custodial at all relevant times."

¶ 13 The court found that M.H. was neglected due to an injurious environment and being left home alone and abused due to a substantial risk of physical injury and that F.H. was non-custodial at all relevant times.

¶ 14 The court proceeded to a disposition hearing. Lisa Blankenship, the family's caseworker at SOS Children's, testified that M.H.'s foster home was safe and appropriate without signs of abuse or neglect. F.H. was consistent in his unsupervised weekly day visits with M.H. at the aunt's house. The visits were without incident. As recommended by the JCAP, because of his past marijuana use, F.H. participated in random drug drops which were all negative. The JCAP did not recommend that F.H. undergo treatment. F.H. still had not obtained stable housing. The issue of

M.H.'s overnight visits with F.H. had not yet been "restaffed." F.H. was "in favor" of the children being returned to C.B., but if that was not possible, he "will happily" take M.H. F.H. also stated that the aunt would be "fine with [F.H. and M.H.] being in her home for the time being" if he gained custody, but Blankenship had not confirmed that statement with the aunt. The agency was recommending a goal that M.H. be returned home within 12 months.

¶ 15    After the hearings, the court entered a series of orders. In an adjudication order, the court found M.H. neglected based on an injurious environment and being left alone for an unreasonable period of time and abused due to a substantial risk of harm. The disposition order found that F.H. was unable to care for, protect, or discipline M.H.; appropriate services for reunification had been unsuccessful; and it was in the best interest of M.H. that he be removed from his parents' custody. M.H. was placed with the guardian administrator of DCFS. The court set a permanency goal of returning M.H. home within 12 months after finding F.H. had made substantial progress toward M.H.'s return and was engaged in weekly visits.

¶ 16    At a proceeding on October 22, 2019, the court was informed that F.H. was visiting with M.H. F.H. had not found stable housing. He continued to support the return of M.H. to C.B. His random drug drops had been negative. The court ordered a stop to the random drops.

¶ 17    The court held a permanency hearing on January 30, 2020. Blankenship testified that M.H.'s foster home at SOS Children's was safe and appropriate. F.H. and C.B. visit the children together. M.H. enjoys the visits and he and F.H. continue to show love and bonding. The court entered a permanency order that changed the goal to returning M.H. home within five months and included a finding that F.H. had made substantial progress toward M.H.'s return.

¶ 18    The court held subsequent permanency hearings on July 28, 2020, and January 28 and July 23, 2021.

¶ 19    At the July 28, 2020, hearing, Blankenship informed the court that F.H. was experiencing cardiac health issues resulting in his hospitalization. He had moved to the aunt's home and was limiting his time outside of the home for fear of acquiring COVID. His health had impacted visitations. At the January 28, 2021, hearing, Blankenship stated that F.H. was continuing to experience cardiac issues and was in and out of the hospital. Since the last court date, he had not officially visited with M.H. through SOS Children's but had some contact with M.H. during C.B.'s visits with the children. His contacts with SOS Children's were "a little hit or miss right now." At the July 2021 hearing, Blankenship stated that F.H. had been facing health issues for a year and had been in and out of the hospital. He sometimes accompanied C.B. on her visits with the children, and if "he is able to, he'll video call" or "meet up." Blankenship thought F.H. was seeing M.H. "every other week, at least by video call." F.H. continued to support the return of the children to C.B. After each of these hearings, the court entered a permanency order setting a goal of M.H.'s return home within five months. Additionally, the July 23, 2021, order stated that "Father is not engaged in services or visits."

¶ 20    The court next held a permanency hearing over several dates: January 10, April 26, and August 30, 2022. As relevant here, Christine Andrews, a caseworker from SOS Children's testified.

¶ 21    Andrews was assigned as the family's caseworker in August 2021. The children were placed in a new foster home with SOS Children's in November 2021. M.H. was now five years old, doing well at the Head Start school program, and continues not to need services. F.H. began living in an apartment and reported that he was recently employed. C.B.'s visits with the children were suspended in July or August 2021 due to an indicated report against her. She again was allowed supervised visits beginning in October 2021. The visits took place at F.H.'s apartment and

were done weekly with C.B., F.H., and the children. From May 2019 to December 2021, F.H. did not visit with M.H. He was "fairly" consistent with visitations from December 2021 through March 2022 while the children were visiting with C.B. Those visits went well and M.H. enjoyed being with F.H. Safety concerns with F.H.'s apartment arose in March 2022 due to a broken door to his apartment and an incident of gun fire in his building and visits were changed to the SOS Children's or C.B.'s home. Since March, F.H.'s visits had been inconsistent.

¶ 22    During her testimony on the August hearing date, Andrews noted that F.H. had moved to a shelter but was working with a housing advocate. Since the end of May, F.H. had unsupervised visits with M.H. twice a month at SOS Children's. Weekly visits did not occur due to his housing issues and work schedule. At the time of one visit, F.H. was in the hospital. M.H. has enjoyed the visits. He and F.H. love each other.

¶ 23    F.H. continued to support the children being returned to C.B. so the children could remain together. Although services initially were not recommended for F.H., there was now a recommendation that he engage in individual therapy which he began in March. The therapy was recommended to assist F.H. in the event M.H. was returned to him. To achieve reunification, F.H. needed to obtain safe housing and become consistent in visitation. Andrews also noted that based on her observations, F.H. "becomes winded." She believed his medical issues may prevent him from "keeping up with a five-year-old" and M.H.'s activities.

¶ 24    There have been discussions with the aunt about guardianship for M.H. The aunt would not be willing to have Ma. B. placed with her.

¶ 25    After a staffing, SOS Children's recommended a goal change to substitute care pending court termination of parental rights (TPR). If the goal was changed to TPR, SOS Children's would

seek a pre-adoptive home for the children and recommended that Ma. B. and M.H. be placed together.

¶ 26    At the end of the permanency hearing, on August 30, 2022, the court entered a permanency order that set a goal of TPR with a finding that M.H's "parents have not made reasonable efforts or progress toward reunification."

¶ 27    The next set of permanency hearings were held on February 24 and August 28, 2023.

¶ 28    At the February 24 hearing, Andrews testified that M.H. was still at Children's SOS and had been referred to individual therapy to assist with future transition. F.H. was successfully discharged from therapy. Shortly after the last court date, F.H. was informed that weekly visitations would be on Thursdays; he attended visits about once a month for a total of seven visits since August. Based on a staffing, SOS Children's again recommended a goal of TPR and that M.H. and Ma. B. be placed together. In a written order, the court concluded that the TPR goal should continue and that M.H. needed permanency.

¶ 29    At the August 28 permanency hearing, Sheila McCusker testified that she has been the SOS Children's caseworker for M.H. and Ma. B. since the end of July. They had several visits, including overnight visits, with the potential foster parents (foster parents). The foster parents previously adopted two other children. M.H. enjoys his visits to the foster parents' home and likes the foster parents and their children. The foster parents are interested in having M.H. and Ma. B. placed in their care; M.H. and Ma. B. have expressed a wish to live with them.

¶ 30    F.H.'s visits with M.H. over the last six months have not been consistent. He visited with M.H. on August 3, which was the first visit since June. F.H. said that work conflicts have prevented him from visiting. Based on a staffing, SOS Children's recommended a goal of TPR. The court entered a permanency order with a goal of TPR.

¶ 31   At a status hearing on December 8, 2023, the court was informed M.H. and Ma. B. had been placed with the foster parents on October 1, 2023.

¶ 32   At a permanency hearing on March 8, 2024, Michelle Ware, the SOS Children's case worker for the family, testified that the pre-adoptive foster home for M.H. and Ma. B. was safe and appropriate with no risks of harm or signs of abuse. M.H. was doing well in school and receiving tutoring. His medical and dental appointments were up to date. M.H. likes the foster home and the other children in the home and wishes to be adopted by the foster parents. F.H. told Ware that he does not know what is happening with the case. He has not visited with M.H. since last year. She recommended a goal of TPR so that M.H. and Ma. B. can be adopted. M.H. is "stabilized" in the foster home and it is in his best interest to remain there. In a written order, the court stated that "(n)either parent is in services or visiting" and set a goal of TPR.

¶ 33   The State, on June 7, 2024, filed a supplemental petition for the appointment of a guardian with the right to consent to adoption (supplemental petition). The State alleged that F.H. was unfit under sections 1(D)(b) and 1(D)(m) of the Adoption Act (ground (b) and ground (m)) (750 ILCS 50/1(D)(b), 1(D)(m) (West 2022)) and section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2022)). The State specifically asserted that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to M.H. (ground (b)) and failed to make reasonable efforts to correct the conditions which were the basis for M.H.'s removal or make reasonable progress toward reunification during any nine-month period following the adjudication of neglect or abuse (ground (m)). The State further asserted that M.H. has been residing with the foster parents since October 1, 2023, they wish to adopt him, and adoption is in his best interest. The supplemental petition requested that F.H.'s parental rights be terminated. On November 12, 2024, the State filed a separate pleading specifying the time periods for the ground (m) claim as: July 11, 2019, to April

11, 2020; April 12, 2020, to January 12, 2021; January 13 to October 13, 2021; October 14, 2021, to July 14, 2022; July 15, 2022, to April 15, 2023; April 16, 2023, to January 16, 2024; and January 17 to October 17, 2024.

¶ 34    The fitness hearing on the supplemental petition was held on December 16, 2024, and January 8 and February 25, 2025. During the hearing, the court admitted the IA dated September 18, 2018, and the service plans from February 2021 and February 2022 into evidence.

¶ 35    The IA revealed that attempts were made to schedule an interview with F.H. but he had not been available. As a result, his interest in visitation and reunification with M.H. was unknown. The IA recommended that F.H. participate in a comprehensive interview to assess his "functioning across domains" and any safety concerns or risks which he may pose. C.B. reported that in the past, F.H. had watched the children when she needed help but told her that he no longer wanted to do so.

¶ 36    The February 2021 service plan noted that F.H. had not been in contact with the caseworker because of his health problems. He was in contact with a housing advocate. The February 2022 service plan stated that F.H. was then living in an apartment and had been in regular contact with the caseworker for the past few months. F.H. attended most of the scheduled visits with M.H. which occurred while C.B. was visiting all of the children. The caseworker recommended additional visitations with F.H. and M.H. F.H. was to be referred to a therapist to assist him in understanding how to care for M.H. Under this service plan, F.H. had an evaluation of "Unsatisfactory Progress/Maintain Outcome."

¶ 37    Blankenship, Andrews, McCusker, Ware and Amaya Harris, the caseworkers for the family, and Paula Burnett, Regional Director with One Family Illinois (One Family), formerly SOS Children's, were called as witnesses. Their testimony as to F.H. and M.H. was as follows.

¶ 38    Blankenship testified that she was the caseworker from 2019 to August 2021. F.H. had "a limited number" of supervised visits, "a handful of maybe five or six." C.B. was present at some visits. F.H. was having health issues. He fully supported the children being returned to C.B. In July 2021, the goal was to return the children to C.B. as she had completed many services. However, in August 2021, DCFS received a hotline call relating to a visit between C.B. and the children.

¶ 39    Burnett testified that she participated in a staffing related to a change in permanency goal for M.H. and Ma. B. in 2022. At that time the goal was to return them home to C.B. in five months. After the staffing, there was a recommendation that the goal be changed to TPR because of newly raised safety concerns with C.B.

¶ 40    Andrews testified that she was the caseworker for about a year between February 2022 and summer 2023. Prior to the goal change to TPR, she referred F.H. to individual therapy and it was an outstanding service. During this time period, F.H. was allowed unsupervised weekly visits with M.H.; his visits were "regular at times" and "sporadic at other times." She thought he attended about half of the scheduled visits. F.H. was having health concerns that may have impacted the visits.

¶ 41    McCusker testified that she served as the caseworker from June through December 2023. During this six-month period, F.H. had one visit with M.H. She had two phone conversations with F.H. during this six-month period. During these phone conversations, F.H. did not ask to schedule visits.

¶ 42    Ware, the caseworker from February to September 2024, testified that she conducted two diligent searches to locate F.H., one in February and one in the summer. She sent letters to an address which she discovered for him. During her time as caseworker, she spoke to F.H. only twice by phone. In August, F.H. called her because he had heard she was trying to locate him. He said

that he wanted reunification with M.H. but needed three more months because of his health issues. F.H. indicated he had been in "hospice." She believed he still needed to complete individual therapy. F.H. did not visit with M.H. during this period.

¶ 43    Harris was the caseworker from mid-September to November 6, 2024. During that time, F.H. did not have any visits with M.H. and Harris had only one contact, a phone call, with F.H. She called him and asked about outstanding services and scheduling a visit with M.H. She left SOS Children's before the scheduled visit date and did not know whether that visit occurred.

¶ 44    At the end of the hearing on February 26, the court in its oral rulings noted that F.H. had health issues "throughout the life of the case" that "played a significant part in his inability to visit on any sort of consistent basis." However, the court believed that he may have lost interest because "he assumed that the children were headed home toward the mother and not because of health." The court found F.H. had failed to take the responsibility of parenting (ground (b)) and make reasonable progress for all seven time periods (ground (m)).

¶ 45    That day, the court proceeded to a best interest hearing. M.T. (M.H.'s and Ma. B.'s foster father) and Kyla Chambers and Teri Moore from One Illinois were witnesses. The testimony as relevant here was as follows.

¶ 46    M.T. testified that M.H. and Ma. B. had been in the foster home since October 1, 2023. His wife and their son (11 years old) and daughter (12 years old) also live in the home. M.H.'s medical, dental, and vision needs were up to date. M.H. has many friends and receives tutoring in the home, plays soccer, and participates in the Lego Club at his school. M.T. participated in a meeting relating to an Individual Education Program (IEP) for M.H. to address possible reading deficits and will advocate for M.H.'s needs. M.H. attends weekly therapy. The foster parents ensure that he attends the therapy and they will follow any recommendations. M.H. is integrated into the extended

family. The foster parents wish to adopt both M.H. and Ma. B. and describe them as "a part of our family."

¶ 47    Chambers, the family's current caseworker, testified that she was assigned to the matter in February 2025. She visited the foster home in February and March and had no concerns as to safety. She found that M.H., now nine years old, was bonded with the foster parents and called them mom and dad. M.H. also had a bond with the foster siblings. M.H. felt comfortable and safe in the foster home and wanted to stay there. The foster parents are committed to M.H. continuing to have visits with Me. B. Chambers believed that it was in M.H.'s best interest to remain in the foster home.

¶ 48    Moore testified that she has been supervising the case since April 2024. M.H. has been in the foster home since October 2023 and there have been no safety concerns. Moore believed that it was in M.H.'s best interest that he remain in the foster home and be adopted by the foster parents and that parental rights be terminated.

¶ 49    At the end of the best interest hearing, the court, orally, noted that M.H. had been in the foster home for one and a half years without safety concerns. The foster parents "have never wavered in wanting to adopt" M.H. as well as Ma. B. and they are all bonded. M.H. now has ties to the community surrounding the foster home, goes to school and engages in activities there. M.H. is in need of permanency. The court found it was in his best interest that parental rights be terminated and that a guardian be appointed with the right to consent to adoption. The court stayed its decision so that a final child and family meeting could take place with C.B., F.H., and the foster parents to discuss future contacts between C.B., F.H., M.H., and Ma. B.

¶ 50    Subsequently, the court on April 22, 2025, entered a termination hearing order finding that F.H. was unfit to parent M.H. on grounds (b) and (m) and terminated his parental rights. A

permanency order set a goal of adoption with a finding that M.H. and Ma. B. were in a home together since October 2023 and they were attached to the foster parents who wished to provide them with a permanent home.

¶ 51     F.H. appealed.

¶ 52     On appeal, F.H. argues that the circuit court committed reversible error after the temporary custody hearing by ignoring his superior right to custody and placing M.H. in the custody of DCFS. F.H. also contends that the circuit court's unfitness findings and best interest determination were against the manifest weight of the evidence.

¶ 53     " 'In Illinois, the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act and the Adoption Act.' " *In re M.I.*, 2016 IL 120232, ¶ 19 (quoting *In re E.B.*, 231 Ill. 2d 459, 463 (2008)). "Illinois policy 'favors parents' superior right to the custody of their own children.' " *Id.* (quoting *In re E.B.*, 231 Ill. 2d at 464).

¶ 54     The State initiates proceedings by filing a petition alleging that it is in the minor's best interest to be made a ward of the court. 705 ILCS 405/2-13(1), 2-13(2), 2-13(3) (West 2022). Upon the filing of a petition, the juvenile court conducts a temporary custody hearing to determine who will have temporary custody of the minor until further hearings can determine whether the minor should be adjudged a ward of the court and where the minor should be placed for permanent custody. *Id.* § 2-10; *In re A.H.*, 195 Ill. 2d 408, 417 (2001). At the temporary custody hearing, the court decides whether there is probable cause to believe that the minor is abused, neglected, or dependent. 705 ILCS 405/2-10(1) (West 2022). If the court finds probable cause, it must determine whether there is an urgent and immediate necessity to remove the minor from his home for his own protection. *Id.* § 2-10(2); *In re Ashley F.*, 265 Ill. App. 3d 419, 424 (1994). After the temporary

custody hearing, the matter proceeds to an adjudicatory hearing, a dispositional hearing, and a permanency hearing. *In re A.H.*, 195 Ill. 2d at 417. Thereafter, section 2-29 of the Juvenile Court Act provides a two-step process to involuntarily terminate a parent's rights. 705 ILCS 405/2-29(2) (West 2022); *In re M.I.*, 2016 IL 120232, ¶ 20.

¶ 55    We begin by addressing F.H.'s contention that at the outset of the case, the circuit court erred when it placed M.H. in temporary DCFS custody instead of temporarily placing M.H. with him. Under the Juvenile Court Act, a child may be removed from his home and DCFS be granted temporary custody where there is an "immediate and urgent necessity." 705 ILCS 405/2-10(2) (West 2018). F.H. acknowledges that while there may have been an immediate and urgent necessity to remove M.H. from C.B.'s home due to C.B.'s neglect, there had been no allegations or findings of neglect against him at that point and he had been willing to take temporary custody of M.H. F.H. argues that as M.H.'s natural father he has a fundamental liberty interest in the care of M.H. (*Santosky v. Kramer*, 455 U.S. 745, 753 (1982)) and a superior right to M.H.'s care, custody, and control than that of any third party (including DCFS). *In re R.L.S.*, 218 Ill. 2d 428, 434 (2006). However, we cannot review the temporary custody order as it is now moot.

¶ 56    The existence of a real controversy is a prerequisite to appellate jurisdiction (*In re Estate of Wellman*, 174 Ill. 2d 335, 353 (1996)) and courts of review do not decide moot questions. *In re Barbara H.*, 183 Ill. 2d 482, 491 (1998). "An appeal is considered moot where it presents no actual controversy or where the issues involved in the [circuit] court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party." *In re J.T.*, 221 Ill. 2d 338, 349-50 (2006). The issue of DCFS's temporary custody of M.H. is moot because we cannot grant the relief that F.H. seeks, which is vacatur, reversal, or modification of the temporary custody order. The temporary custody order has been

superseded by the circuit court's subsequent dispositional orders finding that F.H. was unfit to parent M.H., terminating his parental rights, and finding adoption was in the best interest of M.H. See *e.g.*, *In re V.M.-L.*, 2022 IL App (1st) 220773-U and *In re A.N., L.N., and S.N.*, 2021 IL App (4th) 200548-U[1] (holding that issues surrounding the grant of temporary custody were rendered moot where the temporary custody order was superseded by the subsequent disposition orders). We cannot undo a temporary custody order that is no longer in effect. *Id.*

¶ 57 We next review F.H.'s argument that the circuit court's determination of unfitness was against the manifest weight of the evidence.

¶ 58 Under section 2-29 of the Juvenile Court Act, the State must prove that a parent is unfit pursuant to one of the grounds set forth in section 1(D) of the Adoption Act. 705 ILCS 405/2-29(2) (West 2022); 750 ILCS 50/1(D) (West 2022). After a finding of parental unfitness, the court determines whether it is in the minor's best interest to terminate that parent's rights. 705 ILCS 405/2-29(2) (West 2022).

¶ 59 The State bears the burden of proving by clear and convincing evidence that a parent is unfit under a ground contained in section 1(D) of the Adoption Act. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002). Any single ground, properly established, is sufficient for a finding of unfitness. *Id.* at 495. "Because the circuit court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a circuit court's finding of unfitness only where it is against the manifest weight of the evidence. [Citation.] A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). A reviewing court may not substitute its judgment for that of the circuit court

---

[1] These cases are cited as persuasive authority pursuant to Illinois Supreme Court Rule 23(e) (eff. June 3, 2025), which provides that "a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes."

regarding credibility of witnesses, the proper weight to be accorded the evidence, or the inferences to be drawn therefrom. *D.F.*, 201 Ill. 2d at 499.

¶ 60    The supplemental petition alleged that F.H. was unfit under sections 1(D)(b) and (m) of the Adoption Act. 750 ILCS 50/1(D)(b), (m) (West 2022). The circuit court found that the State had met its burden on both ground (b) and ground (m). For the reasons that follow, we affirm the court's finding that F.H. was unfit under section 1(D)(m) and therefore we need not reach the finding of unfitness under section 1(D)(b).

¶ 61    "[S]ection 1(D)(m) provides two independent bases for a finding of unfitness: (1) the failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child, *or* (2) the failure to make reasonable progress toward the return of the child." (Emphasis in original.) *In re C.N.*, 196 Ill. 2d 181, 210-11 (2001). The court found that F.H. was unfit under the second basis, for failing to make reasonable progress toward M.H.'s return.

¶ 62    Failure to make reasonable progress toward the return of the child is judged on an objective standard, focusing on the steps the parent has taken toward reunification. *In re H.S.*, 2016 IL App (1st) 161589, ¶ 27 (citing *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002)). Reasonable progress is made if the court can conclude that it will be able to order the minor returned to parental custody in the near future. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). At a minimum, the parent must make demonstrable movement toward the goal of returning the child home. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62. Failure to comply with an imposed service plan and infrequent or irregular visitation with the minor may support a finding of unfitness under ground (m). *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 18.

¶ 63    Section 1(D)(m) contains a time frame limitation (750 ILCS 50/1(D)(m) (West 2022)), and thus under this section, we narrow our examination of F.H.'s progress towards reunification,

including aspects such as his compliance with the service plan and regularity of visitation, within the nine-month periods following the adjudication of neglect which are set forth by the State. We may affirm this finding on the basis of a lack of reasonable progress in any of the alleged nine-month periods. *In re S.C.-G.*, 2025 IL App (1st) 241168, ¶ 59.

¶ 64   F.H. argues that he made reasonable progress during each of the nine-month periods in that he completed the IA, with no further treatment recommended; his drug screens were negative; and he identified the aunt as a relative placement. These arguments lack merit.

¶ 65   First, the IA which was admitted at the fitness hearing states that F.H. was not available for an interview to determine his desire for reunification and his need for services. Second, the random drug tests took place early in the case and the court terminated that requirement. No evidence as to the drug tests was presented at the fitness hearing. Finally, the aunt's purported willingness to have M.H. permanently placed with her was never confirmed. The aunt was not willing to care for both M.H. and Ma. B. which was contrary to SOS Children's recommendation that M.H. and Ma. B. be placed together because of their deep attachment to each other.

¶ 66   F.H. also argues that he engaged in appropriate visits which showed his bond with M.H. While this may be true, F.H. was required to have consistent visitation with M.H. to achieve reunification and failed to do so.

¶ 67   The evidence showed that F.H. did not consistently visit with M.H. during any of the nine-month periods set forth by the State, *i.e.*, from July 11, 2019, to April 11, 2020; April 12, 2020, to January 12, 2021; January 13 to October 13, 2021; October 14, 2021, to July 14, 2022; July 15, 2022, to April 15, 2023; April 16, 2023, to January 16, 2024; and January 17 to October 17, 2024. Instead, the evidence, including the testimony of the caseworkers, Harris, Ware, Andrews, Blankenship, and McCusker, showed that during the applicable nine-month periods, F.H.'s

visitations occurred irregularly or did not occur at all. From 2019 to August 2021, F.H. only visited with M.H. about five to six times. Between February 2022 and summer 2023, F.H. attended about half of his scheduled visits. From June to December 2023, F.H. only attended one visit. From February to November 6, 2024, F.H. did not have any visits with M.H. Additionally, the February 2022 service plan recommended that he have more visitations with M.H. Despite that recommendation, F.H.'s visits did not increase and he did not have a significant number of individual visits with M.H. When he did visit, F.H. often did so by visiting M.H. when C.B. was visiting with all of the children.

¶ 68    F.H.'s communications with the caseworkers during the relevant nine-month periods were also inconsistent. Leading up to the February 2021 service plan, F.H. had not been in contact with the caseworker. From June to December 2023, F.H. only had two phone conversations with the caseworker, one in July and one in August and those dealt with M.H.'s adoption. From February to September 2024, the caseworker conducted two diligent searches to locate F.H. During this time, the caseworker had only two contacts with F.H., by telephone, including one in August 2024. From mid-September to November 6, 2024, F.H. only had one phone call with the caseworker. F.H.'s history of irregular or nonexistent communication with the caseworkers who were monitoring his progress did not demonstrate that reunification was possible in the near future.

¶ 69    Additionally, the evidence presented at the fitness hearing raised a question as to the stability of F.H.'s housing, which was a requirement for reunification. The February 2021 service plan stated that F.H. was in contact with a housing advocate to obtain housing. The February 2022 service plan indicated that he had an apartment, but it was later found unsafe for visits due to a broken door and an incident of gunfire in the building. By February 2024, however, F.H.'s location

was unknown. Therefore, through some of the nine-month periods, he was without the type of stable housing where he could care for M.H.

¶ 70 The circuit court's finding that F.H. was unfit under ground (m) for failure to make reasonable progress toward reunification was not against the manifest weight of the evidence based on F.H.'s inconsistent visitations with M.H. and sporadic communications with the caseworkers during the relevant nine-month periods and his lack of stable housing. The evidence established that F.H.'s reunification with M.H. was not imminently achievable.

¶ 71 F.H. argues that we should view his irregular pattern of visitations and communications in light of his health issues. The caseworkers did testify at the fitness hearing that F.H. had reported serious health problems which may have adversely impacted his ability to visit. The fitness hearing, however, did not include clear evidence as to the actual extent of F.H.'s medical issues, the exact nature of his problems or any resulting disability or when the problems arose and their duration.

¶ 72 Even if we assumed that F.H.'s health issues accounted for his inconsistency in visiting with M.H. and in communicating with the caseworkers, we would not reverse the finding that F.H. was unfit for failing to progress during the nine-month periods. As discussed, reasonable progress under section 1(D)(m)(ii) is subject to an objective standard. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 50. "That respondent's personal circumstances prevented him from making reasonable progress is irrelevant to the objective standard." (Internal quotation marks omitted.) *Id.* (quoting *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 73). Further, the plain language of section 1(D)(m)(ii) does not contain exceptions to the reasonable progress provisions. "Where the language is clear and unambiguous, courts may not read into it exceptions that the legislature did not express." *In re J.L.*

236 Ill. 2d 329, 340 (2010). Thus, we are not free to read into the statute any limitations or exceptions for medical or health problems. *Id.*

¶ 73    We next consider F.H.'s challenges to the best interest finding.

¶ 74    " '[O]nce a court has found by clear and convincing evidence that a parent is unfit, the state's interest in protecting the child is sufficiently compelling to allow the termination of parental rights.' " *In re D.T.*, 212 Ill. 2d 347, 366 (2004) (quoting *In re R.C.*, 195 Ill. 2d 291, 308 (2001)). However, the circuit court cannot rely solely on fitness findings to terminate parental rights. *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). Instead, pursuant to section 1-3(4.05) of the Juvenile Court Act, "[t]he court is required to consider factually-based statutory factors, separate from those considered during parental fitness hearings, which focus upon 'the child's age and developmental needs.' " *Id.* (quoting 705 ILCS 405/1-3(4.05) (West 2000)).

¶ 75    Those statutory factors include the physical safety and welfare of the child, including food, shelter, health, and clothing; the development of the child's identity; the child's background and ties, including the familial, cultural, and religious ties; the child's sense of attachments (which includes where the child actually feels love, attachment, and a sense of being valued; the child's sense of security; the child's sense of familiarity; the continuity of affection for the child; and the least disruptive placement alternative for the child); the child's wishes and long-term goals; the child's community ties, including church, school, and friends; the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; the uniqueness of every family and child; the risks attendant to entering and being in substitute care; and the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2022).

¶ 76    The court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his or her emotional and psychological well-being. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 78.

¶ 77    While all these factors must be considered, no single factor is dispositive. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. In addition, the circuit court's best interest determination need not contain an explicit reference to each of these factors, and we need not rely on any basis relied upon by the circuit court in affirming its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. We will not reverse the court's judgment as to termination unless it is against the manifest weight of the evidence. *S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. The court's decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 20.

¶ 78    In the present case, the evidence at the best interest hearing established that M.H. and Ma. B. had been in the foster home for one and a half years without safety concerns. M.H. is bonded with the foster parents and calls them mom and dad. He also has a bond with his foster siblings and is connected with their extended family. The foster parents provide for his health and medical needs and make sure he attends his individual therapy. M.H. has ties to the community of the foster home. He is involved in extracurricular activities and has made friends there. The foster parents have taken steps to assure that M.H. succeeds at school by providing him with a tutor and advocating for an IEP. The foster parents have never wavered in wanting to adopt both M.H. and Ma. B. who have a significant and important attachment with each other. The foster parents are open to M.H. continuing to have contact with Me. B. M.H. wishes to stay in the foster home.

¶ 79    At the time of the hearing, M.H. had been removed from C.B.'s home for six years. F.H. was never his custodial parent. Moore and Chambers testified to their recommendation that

parental rights be terminated and that M.H. and Ma. B. be adopted together and their conclusion that this result was in M.H.'s best interest.

¶ 80 The circuit court's decision that it was in M.H.'s best interest that parental rights be terminated and that he be adopted was not against the manifest weight of the evidence.

¶ 81 F.H. argues that the circuit court's best interest analysis did not adequately consider his positive interactions with M.H. during visits, the importance of the father-child bond and guardianship with the aunt, a family member. F.H.'s visits with M.H. were appropriate and reflected a bond between them. However, at the best interest stage where a parent has been found unfit, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. There was no evidence at the best interest hearing as to any relationship between M.H. and the aunt or as to the aunt's willingness to care for him on a long-term basis. In contrast, the manifest weight of the evidence showed that M.H. has a safe and stable home with the foster parents and siblings and Ma. B. and that he is comfortable and thriving in the foster home and wishes to stay there. The foster parents consider M.H. and Ma. B. part of their family and are willing to adopt them and provide them with permanency. F.H.'s arguments do not show that the best interest determination was against the manifest weight of the evidence.

¶ 82 For the foregoing reasons, we affirm the decisions of the circuit court finding F.H. was unfit to parent M.H., terminating his parental rights and finding adoption was in M.H.'s best interest.

¶ 83 Affirmed.